196 F.Supp.2d 229 (2002)
Peter MELZER, Plaintiff,
v.
BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Carol A. Gresser, Irene Impellizzeri, Victor Gotbaum, Michael J. Petrides, Luis O. Reyes, Ninfa Segarra, Dennis M. Walcott, individually and in their official capacities as members of the Board of Education of the City School District of the City of New York, Ramon Cortines, individually and as Chancellor of the City School District of the City *230 of New York, Joseph DeJesus, individually and as Superintendent of the Bronx High Schools, Hollis Needleman, individually and as Assistant Superintendent of the Bronx High Schools, Edward Stancik, individually and as Special Commissioner of Investigation for the New York City School District, Sean Courtney and The City of New York, Defendants.
No. 93 CV 5942(FB).
United States District Court, E.D. New York.
February 26, 2002.
*231 Eugene B. Nathanson, New York City, for Plaintiff.
Michael A. Cardozo, Corporation Counsel of the City of New York by Jonathan L. Pines, Assistant Corporation Counsel, New York City, for Defendants.

DECISION AND ORDER
BLOCK, District Judge.
Plaintiff, Peter Melzer ("Melzer"), seeks reinstatement to his tenured teaching position at the Bronx High School of Science ("BHSS") claiming, pursuant to 42 U.S.C. § 1983, that he was discharged by the defendant Board of Education of the City School District of the City of New York ("BOE") in retaliation for the exercise of his First Amendment rights as a member of the North American Man-Boy Love Association ("NAMBLA").[1] The discharge was implemented after Melzer, invoking his right to a hearing under New *232 York Education Law § 3020-a, unsuccessfully challenged the BOE's finding of probable cause for his dismissal.[2] The parties have agreed that the testimony and evidence adduced at the hearing, as supplemented by Melzer's in-court testimony, shall constitute the trial record before the Court. The case being tried without a jury, the following constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, resulting in rejection of Melzer's First Amendment claim and dismissal of his complaint.[3]

FACTUAL BACKGROUND

I. Melzer's Teaching Career at BHSS
Melzer graduated from City College with a Bachelor's Degree in Physics in the early 1960's. He started teaching for the BOE in 1963, and is licensed in physics and general science at the high school level and science at the junior high level. At some point early in his teaching career, Melzer received a Master's Degree in Physics Education. In 1968, Melzer began his teaching career at BHSS, where he continued to teach, as a tenured teacher, until 1992. For the 1992-93 school year Melzer was on a one-year sabbatical leave. BHSS is a specialized high school that focuses on a science curriculum. To qualify for admission, students take a competitive scholastic achievement test.
Throughout the course of his teaching career at BHSS, Melzer has taught all grade levels, 9 through 12, in physics and science. Melzer has also participated in a volunteer program to teach physics to area junior high school students as part of a special District Outreach Program. Melzer's other school-related activities included involvement with the Physics Club of New York, advising the Bronx High School Science Physical Science Journal, and organizing the Regional Science Olympiad Competition. Melzer has received numerous teaching commendations, and all of his evaluations have been satisfactory.

II. Melzer's Involvement with NAMBLA
Established in 1978, NAMBLA's Constitution and Position Papers state that it is "an organization founded in response to the extreme oppression of men and boys *233 involved in consensual sexual and other relationships with each other." DX D at 1.[4] Membership "is open to all individuals sympathetic to man/boy love in particular and sexual freedom in general." Id. Specifically, NAMBLA advocates, inter alia:
abolition of age-of-consent and all other laws which prevent men and boys from freely enjoying their bodies
release of all convicted pedophiles abolition of all laws which limit freedom of expression, including child pornography laws
support of all boys and men who voluntarily choose to participate in teenage hustling
opposition to all attempts by the state to interfere with consensual and non-coercive sexuality
replacement of existing age-of-consent laws with laws empowering children including the right to alternative home environments (such as homes operated by children), self-education (i.e., the option not to attend), and the right to conduct their sexual lives with no more restriction than adults
See id. (emphasis in original).
NAMBLA proposes achieving these goals by: "(1) building a support network for such men and boys; (2) educating the public on the benevolent nature of man/boy love; (3) cooperating with the lesbian, gay, and other movements for sexual liberation; (4) supporting the liberation of persons of all ages from sexual prejudice and oppression." Id.
A Steering Committee governs NAMBLA between general meetings of its members. The Steering Committee is comprised of at least twenty NAMBLA members drawn from local chapters, and meets at least every two months. The responsibilities of the Steering Committee include, inter alia, setting membership fees, calling general membership meetings, expelling members for good cause, forming subcommittees for specific activities, voting on organizational matters between general membership meetings, directing the disbursement of funds, and appointing NAMBLA officers. NAMBLA officers include a treasurer, membership secretary, corresponding secretary, recording secretary and international secretary.
Melzer became a member of NAMBLA sometime in 1979 or 1980, and has served the organization in various capacities since that time. Melzer was a member of the group that facilitated drafting NAMBLA's position on child pornography. See Tr. at 4478-91.[5] It states:
NAMBLA supports all voluntary, nonviolent sexual activity. The depiction of such activity is not harmful, so long as those involved agree. NAMBLA calls for the abolition of all laws which limit freedom of expression, including child pornography laws.
NAMBLA condemns those who exploit children and others for profit in pornography and demands just compensation and the full informed consent of those depicted in cases of the commercial distribution of erotica.
NAMBLA condemns pornography which further racial and sexual stereotypes and oppression.
DX D at 6.
Additionally, Melzer intermittently served as a member of the Steering Committee shortly after becoming a member, and as NAMBLA treasurer during the 1980's. See Tr. at 3809.[6] As early as *234 1982, Melzer was also actively participating in the organization by serving on the editorial staff of the Bulletin, known as the Collective. The Bulletin is a newsletter published by NAMBLA ten times a year, containing various articles relating to NAMBLA's goals. The Collective is responsible for determining the content of the Bulletin, and includes all NAMBLA members working for the Bulletin. All members of the Collective are listed on the Bulletin masthead, and have a voice in choosing articles for publication. See Tr. at 3968-69. Melzer, on occasion, exercised his right to veto articles. See id. The Bulletin is made available to NAMBLA members by direct mail, and is offered for sale to the public at various magazine and book stores. NAMBLA does not investigate whether subscriptions are purchased by children or adults; it will distribute the Bulletin to anyone who pays for it. See Tr. at 4554.
In the March-April 1982 issue of the Bulletin, Melzer expressed "disillusionment and disappointment" with NAMBLA's priorities and leadership. DX E at 5. As a result, Melzer resigned from the Steering Committee and the Collective by authoring an article entitled "Taking a Leave of Absence." Id. The article concluded, "[w]ere I fulfilled as a boy-lover, I would be much more at ease waiting for the millennium or working in an inefficient environment. Right now, personal priorities dictate that I get my own head together as a boy-lover. When and if that occurs, I hope to come in again with renewed vigor." Id.
However, by March 1983 Melzer again was appearing on the masthead as a member of the Bulletin Collective. In the December 1986 Bulletin,[7] Melzer authored an article entitled "Police Infiltrator." DX G. The article commented on the activities of Kevin Healy ("Healy"), a detective with the Manhattan South Public Morals Division of the New York City Police Department, who posed as a NAMBLA ally. Healy was reported by Melzer to be responsible for a "web of lies and coercion" that led to the arrest of a NAMBLA Steering Committee member. Id. In a continuation of the police infiltrator story in the January-February 1987 issue of the Bulletin, Melzer wrote that Healy preyed on vulnerable members of the organization and caused one of them to mail a file of "my Bulletin articles to my employer." DX H. Melzer stated in the article that he had given testimony at the trial of the NAMBLA member who was arrested, and he encouraged people to contribute to that person's defense fund because he was an important member of the NAMBLA community and "fought tirelessly to get NAMBLA recognized." Id. Melzer does not believe that an individual who has sex with an under-aged youth should go to jail. See Tr. at 4667. Furthermore, he believes that the laws criminalizing sexual acts with children "are not humane and many laws are applied in an inhumane way." Tr. at 4502.
In the June 1987 Bulletin, a letter by Melzer to the Editor of the New York Post was reprinted, wherein Melzer wrote that "NAMBLA believes that the ability to experience sexual pleasure is a gift enjoyable by everyone regardless of age or sex and should be the right of everyone regardless of age or sex." DX I. Melzer further explained that although NAMBLA is opposed to child abuse, NAMBLA "[does] not accept the view that erotic acts involving *235 young people are automatically abusive or exploitative." Id.
Sometime between August 1987 and October 1991, the Bulletin began incorporating a statement of "Where We Stand" in every publication. See DX K.[8] "Where We Stand" is a statement of NAMBLA's purpose, proclaiming: "[w]e work to organize support for boys and men who have or desire consensual sexual and emotional relationships and to educate society on their positive nature. We speak out against the oppression endured by men and boys who love one another and support the right of all people to consensual intergenerational relationships." Id. Included in the October 1991 issue was a guide to "Staying Safe and Happy as a Man/Boy Lover." Id. The guidelines were "developed by NAMBLA activists." Id. Included in the guidelines was advice on how to survive in a culture hostile to NAMBLA. It explained, inter alia, how to deal with police, where to store erotica, how to keep specific information about the identity of your lover a secret; furthermore, it advised not to keep photos where police might find them, and never to discuss "the specifics of an illegal relationship with therapists or social workers." Id.
Melzer authored an article in the January-February 1992 Bulletin entitled "Thanksand stay generous." DX L. The article acknowledged receipt of $1,000 in contributions, urged continued donations, and boasted that membership "became 1,000 strong for the first time in our history." Id. The March 1992 issue contained an article by Melzer entitled "Keeping Up the Barricades." DX M. It commented on the ability of some of NAMBLA's members to "present an image of strength to the hostile hordes," solicited further contributions, and noted that "our mission [is] steadfast. We are the good guys. We have prevailed for [almost] fourteen years, and with your help we will continue to do so." Id. A piece in the July-August 1992 Bulletin noted that Melzer was one of three NAMBLA representatives to attend the "6th annual International Pedophile and Youth Emancipation (IPCE) conference" in Amsterdam, Holland. DX O. "Much of the three-day meeting [was] used to share information about the situation for the boy-love/pedophile movement in the various countries represented." Id.
In November 1992, Melzer reappeared on the Bulletin masthead as a member of the Collective. Also included on the masthead, as in many other issues, was a statement that the [Bulletin] content "is determined by the Bulletin Collective, which includes all NAMBLA members working for the Bulletin." DX P. In the "Letters" section of the following issue, which again listed Melzer as a member of the Collective, an anonymous letter addressed to NAMBLA entitled "Good Touches" appeared. DX Q at 8. "Good Touches" explained how to "make that special boy feel good." Id. It made suggestions regarding specific body parts and how best to "rub" them. Id. It concluded that all the "suggestions are even better when done in a warm shower." Id. In general, Melzer believes that the "Letters" section of the Bulletin had "value." Tr. at 4351. With respect to this particular letter, Melzer considered it "humorous," as "a take-off on some of the ... good touch, bad touch advice that ... some professionals ... go around to schools ... tell[ing] youngsters [about]." Tr. at 4344.
In January-February 1993, the Bulletin included an article about "the `missing children' hysteria," and characterized it as "little more than hype from self-serving *236 bureaucratic child-savers." DX R. The issue also contained a "Letter to a Young Boy-Lover." Id. The letter purported to be a response to a letter from a "17-year old boy lover." Id. It gave advice about how to entice susceptible children into sexual acts. Although Melzer did not agree with the letter, he thought it was more beneficial than harmful because "most people reading this, even in that narrow audience would [not] take that advice. I think this is more of an emotional release just like being in a psychiatrist's chair." Tr. at 4540.
The June 1993 Bulletin, still listing Melzer as a member of the Collective, contained a letter entitled "In Praise of Penises." DX V. The letter celebrated oral sex with pre-adolescent boys. Melzer considered the letter to be merely an "emotional safety valve," an "outlet" for fantasies. Tr. at 4531. Melzer considered many of the articles published in the Bulletin to be such "emotional safety valve[s]." Tr. at 4352; see also Tr. at 4419.

III. Relationship Between Melzer's NAMBLA Activities and His Teaching Responsibilities
Melzer readily admits that he is a boy lover, and is attracted to boys up to the age of about 16. See Tr. at 3911, 4102, 4499. Nonetheless, the record does not contain any evidence that Melzer has ever engaged in a sexual relationship with someone under the legal age of consent seventeen.[9]
Melzer acknowledges that teachers often figure prominently in students' lives as role models; "many youngsters latch on to an adult ... and want to behave like him." Tr. at 3361. However, Melzer believes that taking an active role in NAMBLA does not compromise his high standard of conduct or character as a teacher; rather, it shows "intelligence and responsible behavior." Tr. at 4459. Melzer testified that he never spoke about his views on sexuality in the classroom, and that his students never asked what he did in his spare time, other than an occasional inquiry about vacations. Melzer does not believe that laws should be broken; given society today, he believes it is unhealthy for underage youths to engage in sexual acts with adults because the psychological and social repercussions would be great. When asked to square this with his belief in NAMBLA's goals, Melzer was evasive; he continually digressed into rambling, non-responsive replies. When pressed, Melzer explained that he interpreted NAMBLA's stated purpose to mean that "theoretically it is possible for youngsters below the age of consent in certain localities to be able to, you know, that this would be all right." Tr. at 3816. He further testified that a sexual relationship with a child is "not necessarily" harmful. Tr. at 4503.
Dr. Fred S. Berlin ("Dr. Berlin"), a licensed psychologist, appeared as an expert on Melzer's behalf and testified that Melzer would not personally be sexual with a youngster, regardless of his association with NAMBLA, because he is cognizant that in "American society in 1996 for a variety of reasons that children are at risk of being harmed." Tr. at 2467. Dr. Berlin did not believe Melzer posed a threat to the students; he opined that there is no evidence "that a given student is likely to be so traumatized by this that it would impair them and cause them significant problems." Tr. at 2516-17.
Dr. Donald J. Lewittes ("Dr. Lewittes"), also a licensed psychologist, testified on behalf of the BOE and concluded otherwise. He opined that student knowledge of *237 Melzer's affiliation and activities with NAMBLA
would be an extremely anxiety provoking and disruptive experience for the average child and adolescent to be subjected to in a relationship where they have less power, that is, as a student, where they are assigned, where they have no right of option themselves to control their destiny, where they are highly dependent upon this person to perform acts such as teaching and grading which involves their future and specifically having to do with the sexual identity and development of adolescents, the feelings engendered by knowing that an authority figure has encouraged the disavowal or disruption of legal and moral codes that their families and the general community hold. These all would affect my opinion in relating that these children would react with anxiety, with fear and in my opinion, the average adolescents in that situation would have strong feelings about being assigned to an authority teacher.
Tr. at 1747-48.
Also relevant to Melzer's role as a teacher was his obligation, pursuant to a BOE resolution, to report to the Office of the Deputy Commissioner of Investigation ("DCI") "any and all information concerning corrupt or other criminal conduct, conflicts of interest, unethical conduct, or misconduct by officers or employees of the City School District of the City of New York or by persons dealing with the City School District." DX HH. Failure to do so would be cause for removal. In addition, Melzer was obligated, pursuant to Chancellor's Regulation A-750, to report to DCI any information he might receive regarding sexual misconduct involving students, by anyone, at any time, whether on or off school premises. The Regulation provides that "[s]exual relationships with students are prohibited, regardless of a student's age." Id.
When asked to reconcile the inherent conflict between his reporting responsibilities and NAMBLA's stated goals, Melzer responded as follows:
Q: I am asking you if in a NAMBLA meeting someone ... admitted to having sex with an underaged youth identified by name would you report that person to the authorities?
A: If the way it was described in an unlikely set of circumstances someone insisted and said I do not care and gave the name, address and all that yes, they have no choice.
Q: What if the person admitted to having a sexual relationship with an underaged youth but did not provide the name, address and whatever other particulars you referred to, what would you do?
A: From my point of view it would be too vague. I would tell them to cease and desist, you are on very dangerous ground. You may be fantasizing, you may not be. I would point out the potential harm that he is causing and point out to him that, you know, there is a strong likelihood that I would report it.
Q: Have you ever reported anyone who is a member of NAMBLA to the authorities for any reason?
A: No, that situation never occurred.
Q: You would view your reporting that person an [sic] inconsistent with NAMBLA's stated goals, providing support to people who are in man/boy love relationships?
A: It would be a very difficult conflict but, you know, as a teacher I think I have more of awhat is the word, loyalty to teaching than to NAMBLA.

Tr. at 4531-32 (emphasis added).

IV. Investigation and Repercussions
Melzer's membership in NAMBLA was first disclosed to a limited number of *238 BHSS and BOE officials in 1984-85 when an anonymous letter was sent to then-BHSS principal Milton Koppelman. An interview was conducted by the BOE's Office of the Inspector-General ("OIG") on March 29, 1985, during which Melzer declined to confirm whether he was a member of NAMBLA. No administrative action was taken against Melzer at that time.
The investigation into Melzer's NAMBLA membership was reopened in May, 1992 by the Office of the Special Commissioner of Investigation for the New York City School District ("SCI"). The SCI was established in 1990 by mayoral executive order, and is responsible for the "investigation of corruption, conflicts of interest, unethical conduct and other misconduct within the school district of the City of New York." PX 15 (attaching Executive Order No. 11 from the Office of the Mayor, David Dinkins (June 28, 1990)).[10] The SCI reopened the Melzer investigation because it was an unresolved case left over from its predecessor entity, the OIG. Sean Courtney ("Courtney"), Special Counsel to Special Commissioner Edward F. Stancik ("Stancik"), was assigned the task of reviewing the files relating to Melzer and determining if further action was warranted.
While Courtney's investigation was ongoing, WNBC TV Channel 4 aired a three-part news story by investigative reporter John Miller ("Miller") on March 2, 3 and 5, 1993. The news story identified Melzer as a physics teacher at BHSS and an active member of NAMBLA. The story included excerpts from a secretly taped meeting of the New York City chapter of NAMBLA at which Melzer was shown advising a nontenured employee of the BOE to lay low regarding his NAMBLA affiliation and activities until he became tenured. Miller also was seen interviewing BHSS students and attempting to interview Melzer. Soon thereafter other print and electronic news media picked up the story and further disseminated Melzer's name and image, along with his position at BHSS and his NAMBLA membership.
After the NBC story aired, the BHSS community was rampant with discussions of Melzer. In response, then-BHSS principal Vincent Galasso ("Galasso") convened his cabinet group of approximately ten individuals, including the Chairman of the Academic Department, the Assistant Principal for Pupil/Personnel Services, and the Assistant Principal for Administration. The cabinet discussed its concerns regarding the publicity generated by the news story, the possible effect of the news story on recruitment, and whether Melzer should be teaching children. Galasso also spoke with approximately 75-100 teachers, the majority of whom agreed with the concerns of Galasso's cabinet, and believed that Melzer should not return to the classroom.
A meeting of the BHSS Parents' Association ("PA") was held on March 3, 1993, right after the first part of the NBC news story aired. At the meeting, attended by Galasso and approximately 300 parents, many parents expressed anger over Melzer's NAMBLA affiliation and stated that they would do whatever was necessary to prevent Melzer's return to the classroom, including picketing, removing their children from BHSS, and urging other parents to do the same. At the conclusion of the meeting, a committee was appointed to draft a letter to the Chancellor, Joseph Fernandez, the Mayor, and other public officials, which would be reviewed, and was approved, at an emergency meeting the following week. The letter demanded a meeting with the Chancellor and requested, among other things, that "neither Mr. Melzer nor any other known member of *239 NAMBLA [] be in a position of daily sanctioned contact with the children of the Bronx High School of Science, or of any other school within the New York City public school system." DX DD. The requested meeting was convened towards the end of March 1993. At the meeting, parents told Chancellor Fernandez that they did not want Melzer to return to the classroom, and that they would boycott BHSS and bring in the news media if he returned.
On or about March 11, 1993, Student Organization President Ghihee Su and the Student Organization Cabinet distributed a notice announcing two student meetings to be held in the BHSS auditorium, scheduled for the first and ninth periods the following day, to discuss the Channel 4 news story. Galasso, who was invited to attend the meetings, stated that their purpose was to "let the students know what the student leaders knew and to get response from the kids to see how they felt about the issue." Tr. at 172. Approximately 300-400 students attended the first period meeting. Of approximately 30-40 student speakers, the majority spoke against Melzer's return to the classroom. At the second meeting, of approximately 50-100 students in attendance, twenty students spoke, and again the majority of speakers were against returning Melzer to the classroom. According to Galasso, "some students were quite blunt about their feelings" that they "would not want to be in a classroom with somebody who had those kinds of  that kind of value system that they could advocate adults having sex with young boys. The notion was expressed that it would be hard to concentrate in a classroom if you knew the teacher was  belonged to an organization and might be having thoughts aboutthat were not appropriate." Tr. at 199-200. Galasso concluded that "a very, very large majority of the students felt negatively towards the concept of NAMBLA, the ideals that they espoused, and that they would notthey were not happy that Mr. Melzer was associated with that group and they would not be happy to have him back." Tr. at 181. A few dissenters at each meeting expressed the opinion that "a person who was not convicted of doing something should be allowed to practice their business, their trade, their profession." Tr. at 177.
In addition, Galasso spoke informally with several hundred students in the hallways or while passing through the cafeteria. See Tr. at 183. Galasso heard some students express disgust, whereas others wanted to know if Melzer was "going to be allowed back into the school?" Tr. at 183. Other students went so far as to be "graphic about the kind of sex that men and boys might have," and indicated their repulsion to such a notion. Tr. at 200. Another concern that students expressed was "reluctan[ce] to approach Mr. Melzer after class" to discuss the course material, either because their peers would inappropriately speculate as to the reason for such an after-class meeting or "a student might ... be teased." Tr. at 200-01. Based on these conversations, Galasso believed it was "very, very clear [that] the majority of the number of kids" did not want Melzer to return to the classroom; "well over 90 percent ... were unhappy with NAMBLA and Mr. Melzer's association." Tr. at 183. In Galasso's opinion, if a student is "thinking about something that is repugnant to them, it might make it more difficult for them to learn the physics that they are supposed to be learning." Tr. at 200.
School publications ran articles concerning the controversy over Melzer's NAMBLA activities. The articles presented viewpoints of the students and attempted to present both sides of the issue. One article discussed the pros and cons, expressing the pros as "[n]o matter how *240 strange a lifestyle might appear, our society gives people the right to express their views," and the cons as "[h]e should ... be condemned ... for his actions, which I believe are utterly detestable." PX 5.
Undaunted by the public reaction regarding his NAMBLA membership, Melzer authored an article for the June 1993 Bulletin entitled "Outed on NBC." DX V. The article addressed the NBC exposé. Melzer stated that he "had never hidden [his] participation in NAMBLA since [he] wrote Bulletin articles under [his] own name and openly marched under NAMBLA's banner." Id. Furthermore, he noted that were he "not currently on sabbatical leave" he would surely be suspended from the school; the NBC story "caused a major stir" at BHSS and he expected "very significant developments to follow from this." Id. Melzer concluded, "[f]or my part, despite ominous threats to my career, I have no regrets. I have always been aware of the remote possibility of this happening. I am fully prepared for the struggle to come." Id.
Based on his conversations with teachers, students and parents, Galasso believed that Melzer could not successfully return to the classroom because the majority of the people he spoke with were "firmly opposed to [NAMBLA's] views and beliefs, that it is detrimental to the educational process, that the parents would not allow the school to operate if a person who has those opinions were in the school building and that many of the students would, in fact, opt not to report to a class if they were assigned to a man who had those opinions." Tr. at 216-17. In addition, Galasso believed that picketing would be particularly troublesome because many students might not want to cross a picket line. In his opinion, lack of attendance, in addition to impeding the learning process, would create public relations problems by attracting further negative attention to the school. Moreover, according to Galasso, "people have to apply to come into the school, they have to travel long distances a lot of times and it would not be an incentive for people to do that if they felt that the atmosphere in the school was chaotic," thereby reducing the number of applicants to the school and consequently diminishing the school's competitive edge. Tr. at 209.
The testimony of Nicholas deJesus,[11] then Bronx Superintendent of High Schools, echoed Galasso's concerns. He believed that returning Melzer to the classroom was inappropriate because there was a "significant sense of lack of trust and ability to properly protect the interests of students," Tr. at 2282, there was concern for the school's reputation, concern that Melzer could not fulfill his reporting obligations, concern whether students would attend Melzer's classes, and concerns about the threatened protests, boycotts and walkouts. DeJesus concluded that reassigning Melzer's students and addressing the concerns of the community would pose an immediate, significant threat to the otherwise smooth and efficient operations of the school. See Tr. at 2282. Consequently, sometime during the Spring semester of 1993, deJesus informed Melzer that he would not be permitted to return to the classroom in the fall, after his sabbatical leave expired. Pending the result of the SCI investigation and action by the BOE, deJesus reassigned Melzer "to non-school offices." See Tr. at 2320-21.

V. The BOE Action and Dismissal
In September 1993, Courtney issued a report on behalf of the SCI entitled "An Investigation into Misconduct Relating to Pedophilia by Peter Melzer, a Teacher at the Bronx High School of Science" (the *241 "Report"). DX BB. The Report noted that "[b]ecause of the special status of Bronx Science in the school system and the high level of commitment and organization by the parents of its students, it seems clear that parents and students will stay and fight for Melzer's removal or, at the very least, for Melzer's removal from unsupervised contact with students. For its part, the school system will have no practical choice but to comply sooner or later with parents' requests to re-assign their children from Melzer to other teachers. It is impossible to believe that school officials would seek to have boycotters declared truant and then to obtain court orders to compel them to attend Melzer's classes." Id. at 26.
In conclusion, the Report recommended that the Board of Education impose severe disciplinary action against Mr. Melzer, which could appropriately include termination of employment. At a minimum, disciplinary action should include the complete and permanent removal from unsupervised contact with students. He should not be returned to the classroom . . . Even if one does not consider Melzer a risk to sexually abuse his students, his misconduct in aiding the Bulletin in publishing the advisories for pedophiles [] makes him unfit to teach children. Articles advising pedophiles to use sexual jokes and pornography to identify sexually curious youngsters are hardly academic musings. Indeed, such articles could serve as an instruction manual in the sexual abuse of children and can reasonably be assumed to have led to such abuse. A person who would willingly aid such a venture should not be entrusted with the care of children . . . We have examined the constitutional issues involved here, and feel the Board is entitled to take Melzer's advocacy of these forms of child abuse into account in evaluating his fitness to teach. Further, Bronx Science has an undeniable interest in the smooth operation of its educational activities. This operation has already been disrupted through Melzer's misconduct. Bronx Science has an excellent history and reputation which have led to extraordinary confidence on the part of parents in the school's ability to provide a sound education. That confidence has been at least temporarily disrupted by Melzer and his activities. Additional and more serious disruption, as well as a permanent diminishment of parental confidence, seems inevitable if Melzer is returned to the classroom.
Id. at 45-46.
Following receipt and consideration of the Report, the BOE preferred charges against Melzer, unanimously finding that probable cause existed to undertake disciplinary proceedings, including possible termination. See DX B.[12] The charges specified that Melzer
advanced the goals and activities of NAMBLA, and assisted in the publication of the NAMBLA Bulletin, including at times editing, writing and raising funds for this publication, all of which promoted illegal sexual activity between male adults and male children under the age of consent, an activity proscribed by Article 130 of the New York Penal Law. During portions of this period, [Melzer] was listed on the masthead of the NAMBLA Bulletin and occupied an important position in this organization. [Melzer's] activities on behalf of NAMBLA have been widely reported, and have caused disruption in his school and the school community, and undermine his ability to serve as a teacher.
*242 DX B. The BOE informed Melzer of his right, pursuant to New York Education Law § 3020-a, to request a hearing before a three-member panel or a single hearing officer, to contest the charges. Melzer chose the latter.

VI. The Hearing
The hearing began on November 9, 1994. Thirty-three days of hearings took place over the course of the next three years, concluding on May 5, 1997. On April 22, 2000, in a carefully considered and reasoned 93 page opinion and award, the hearing officer sustained the BOE's charges and determined that Melzer should be terminated. The standard of review applied by the hearing officer was whether the BOE had "establish[ed] a nexus between the conduct and one or more legitimate interests of the [BOE]." Melzer Opinion and Award at 39. The hearing officer considered whether the BOE had established that Melzer's "off-duty conduct either `directly affect[ed] the performance of the professional responsibilities of the teacher, or if without contribution on the part of the school officials, the conduct has become the subject of such public notoriety as significantly and reasonably to impair the capacity of the particular teacher to discharge the responsibilities of his position.'" Id. at 39-40. (quoting Matter of Goldin v. Board of Education, 35 N.Y.2d 534, 364 N.Y.S.2d 440, 324 N.E.2d 106 (1974)). In applying this standard, the hearing officer found it unnecessary to "engage in any kind of extensive analysis of the First Amendment in resolving the central issues in this [case]," id. at 76, as "proper application of" the nexus/legitimate interests test "is a standard of review that takes into account the First Amendment." Id. at 77. The hearing officer reasoned that:
[Melzer's] off-duty conduct, particularly in his position as a member of the NAMBLA Bulletin Collective, has created the reasonable appearance that [Melzer] has approved material that endorses and possibly promotes actual sexual activity between men and boys in violation of the New York State Penal Law. It is this characterization of [Melzer's] off-duty conduct that allows the analysis to proceed. If [Melzer's] association with NAMBLA and the reasonable perceptions created thereby could not support this characterization, this Arbitrator has serious doubt that the First Amendment would permit the [BOE] to impose discipline upon [Melzer] notwithstanding the strength of parental and student opposition to [Melzer's] return to the classroom.
The [BOE] has shown the existence of legitimate interests harmed by the above characterization of [Melzer's] off-duty conduct. As the findings above state, [Melzer's] association with NAMBLA and the reasonable perceptions thereof have and will predictably cause significant disruption to the [BOE's] ability to deliver a valid educational experience to the students at BHSS. Moreover, [Melzer's] ambivalence about the need for age of consent laws coupled with his acknowledgment of a very difficult conflict between his NAMBLA membership and his duty to report child abuse, in this Arbitrator's estimation, independent of perceptions, has allowed the [BOE] to posit a valid reason why it has substantial concerns of its own right regarding [Melzer's] return to the classroom.
Id. at 88-91 (internal quotation marks omitted).[13]

*243 DISCUSSION
Melzer argues that his "participation in NAMBLA and publication of the NAMBLA Bulletin was expression on public issues and therefore on the highest rung of the hierarchy of First Amendment value." Pl.'s Mem. Law at 8. He claims that he was terminated in retaliation for his expressions, which were "unrelated to his job and spoken outside the employment context;" therefore, the employment action was unconstitutional. Id. at 8-9.
Defendants contend that Melzer's First Amendment claim should be dismissed because Melzer's expressions did not touch on a matter of public concern. In the alternative, they argue that their "interests in preserving the [BOE's] educational mission, and in providing parents and students with teachers in whose judgment they can reasonably rely, far outweigh [Melzer's] limited interest in speaking upon matters far removed from educational policy, and in which the public has no interest." Def. Mem. Law at 77.

I
More than three decades have passed since the Supreme Court announced in Pickering that to determine whether public employers violate the First Amendment by disciplining their employees for their speech requires "arriv[ing] at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." Pickering v. Board of Educ. of Township High School Dist. 205, Will. Cty., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The rationale for the need to discern whether the employee's speech be upon a matter of public concern, as subsequently explained in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), is that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. at 147, 103 S.Ct. 1684. The so-called "public concern" doctrine has consequently evolved as the threshold question of constitutional law regarding matters of speech in or about the workplace prior to the application of a Pickering balance. See Knight v. Connecticut Dep't of Public Health, 275 F.3d 156, 164 (2d Cir.2001) ("If the public employee speech does not touch on a matter of public concern, it is not entitled to First Amendment protection; if, however, it does touch upon a matter of public concern, we must balance the interests of the employer in providing `effective and efficient' public services."); Lewis v. Cowen, 165 F.3d 154, 161 (2d Cir.1999) ("In determining whether employee speech is protected by the First Amendment, a court first must decide whether the speech addresses a matter of public concern.").
In Knight, the Second Circuit recently synthesized the standard that has developed as a consequence of Pickering and Connick in arriving at a proper Pickering balance:

*244 [The Court] must consider whether the statement sought to be protected impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. Further, the more the employee's job requires confidentiality, policy-making, or public contact, the greater the state's interest in firing her for expression that offends her employer. Also important is the manner, time, and place of the speech. While the burden of proof lies with the government, the State need show only a likely interference with its operations, and not an actual disruption.
Id. (internal citations and quotations omitted).
Thus, the government can discipline an employee for speaking on a matter of public concern "if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." Heil v. Santoro, 147 F.3d 103, 109 (2d Cir.1998) (internal citations omitted). From the employee's perspective, the public employer will be liable if it disciplined the employee "in retaliation for the speech, rather than out of fear of ... disruption." Lewis, 165 F.3d at 163. This means that the employee must establish that "the speech was a substantial or motivating factor in the adverse employment action." Id. at 162. Nonetheless, "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." Heil, 147 F.3d at 110; see also Locurto v. Safir, 264 F.3d 154, 166 (2d Cir.2001).

II
In its application of Pickering, the Second Circuit has invariably been confronted with cases involving speech by public employees on matters of public concern at or about the governmental workplace, see, e.g., Knight, 275 F.3d at 160 (proselytizing at hospital while working with patients); Hale v. Mann, 219 F.3d 61, 64-66 (2d Cir.2000) (adoption and transmittal of report critical of employer's policies); Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 133 (2d Cir.1999) (contacting OTB Inspector General about problems at OTB); Lewis, 165 F.3d at 157 (voicing objections to new lottery policies to Connecticut Gaming Policy Board); Clue v. Johnson, 179 F.3d 57, 59 (2d Cir. 1999) (criticism of management's labor policies by union faction); McEvoy v. Spencer, 124 F.3d 92, 95-96 (2d Cir.1997) (Police Commissioner's criticism of police department); Sheppard v. Beerman, 94 F.3d 823, 826 (2d Cir.1996) (law clerk's criticism of judge); Jeffries v. Harleston, 21 F.3d 1238, 1241 (2d Cir.1994), rev'd on remand, 52 F.3d 9 (2d Cir.1995) (derogatory statements about Jews during off-campus address by chairman of college Black Studies department concerning bias of public school curriculum and history of black oppression); Piesco v. City of New York, Dept. of Personnel, 933 F.2d 1149, 1151 (2d Cir.1991) (job-related testimony before governmental committee), cases where there existed job-related personnel matters falling under Connick's proscription, see, e.g. Ezekwo v. NYC Health & Hospitals Corporation, 940 F.2d 775 (2d Cir. 1991) (resident doctor's complaints aimed at protecting his reputation and individual development), or cases where there existed an independent basis for the discipline unrelated to the protected speech. See, e.g., Heil, 147 F.3d 103 (hindering lawful investigation into dissemination of confidential material cause for discipline even if speech *245 be deemed protected); Blum v. Schlegel, 18 F.3d 1005, 1013 (2d Cir.1994) (denial of tenure unrelated to professor's advocacy in campus publications of legalization of marijuana and criticism of national drug policy); Selzer v. Fleisher, 629 F.2d 809, 812 (2d Cir.1980) (remanding for new trial because of failure to charge jury whether tenure would have been denied regardless of professor's CIA involvement).
In the present case, the Court concludes that Melzer was terminated solely because his employer reasonably believed that the public exposure of his associational activities outside of the workplace as a member of NAMBLA was likely to impair Melzer's effectiveness as a teacher and cause internal disruption if he were returned to the classroom. Given this conclusion, conceptual analysis does not fit neatly within the paradigmatic factual pattern out of which the Pickering/Connick test has developed, and which has to date been the focus of Second Circuit precedent. In that pattern, "employee speech has invariably involved some form of criticism or questioning of the public employer's policy, or of its specific actions, or of supervisory personnel expressed either privately to the employer or publicly," thereby creating "the clash of public employee and public employer interests in employee speech rights in its most direct and easily identified form: the employee's right to criticize or disagree with governmental operations versus the governmental interest in avoiding the internally disruptive effect of the very criticism or disagreement." Berger v. Battaglia, 779 F.2d 992, 997 (4th Cir.1985). How then should the court evaluate those situations, such as the present case, falling outside of the paradigmatic Pickering/Connick fact pattern?
To begin, although the Supreme Court has recognized, true to that paradigm, that cases involving application of the Pickering balancing test "usually have involved" disciplinary actions taken in response to an employee's "job-related speech" on matters of public concern, United States v. National Treasury Employees Union, 513 U.S. 454, 465-466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), it has also recognized that its application is not limited to speech on matters of public concern at or about work; rather, Pickering balancing is triggered whenever a public employee's expressions on matters of public concern are sought to be circumscribed by governmental interdiction. Thus, in Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court "directly applied the Pickering balance to speech [on a matter of public concern] whose content had nothing to do with the workplace," National Treasury, 513 U.S. at 466, n. 10, 115 S.Ct. 1003, although it occurred in the workplace,[14] and in National Treasury, in striking down a section of the Ethics in Government Act prohibiting the receipt of honoraria by government employees, the Court directly applied Pickering balancing in assessing comment by government employees on matters of public concern regarding compensated speeches and articles "addressed to a public audience [which] were made outside the workplace, and involved content largely unrelated to their government employment." Id. at 466, 115 S.Ct. 1003. This view of Pickering is in keeping within "the precedents in which Pickering is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs;" the issue in such cases being "whether government employees could be prevented or `chilled' by the fear of discharge from joining political parties and other associations that certain *246 public officials might find `subversive.'" Connick, 461 U.S. at 144-45, 103 S.Ct. 1684. Second Circuit precedent recognizes this broad-based principle. See, e.g., Bieluch v. Sullivan, 999 F.2d 666 (2d Cir.1993) (applying Pickering balancing to speech on matters of public concern in the course of political community activities unrelated to job); James v. Board of Educ. of Central District No. 1, Addison, 461 F.2d 566 (2d Cir.1972) (applying Pickering balancing to symbolic wearing of black armband by teacher in school to protest Vietnam War).
Melzer has joined an association that expresses views and aspirations clearly repugnant to the sensibilities and belief systems of the community at large, the Court and his public employer. Nonetheless, Melzer's right to join this expressive association as a citizen, regardless of its views, and to participate in its activities, is protected by the Constitution.
Initially, freedom of association sweeps broadly. See NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ("Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty assured" by the First Amendment, and is "undeniably enhanced by group association"); Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ("While the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition."); Boy Scouts, 530 U.S. at 647, 120 S.Ct. 2446 (no matter how unpopular, "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends") (internal citation and quotation marks omitted). Second, while constitutional protection will not be accorded to advocacy that is "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action," Healy, 408 U.S. at 188, 92 S.Ct. 2338 (internal citation and quotation omitted), a member of such group cannot be punished unless there is "clear proof that [he] `specifically intend(s) to accomplish (the aims of the organization) by resort to violence.'" Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (quoting Noto v. United States, 367 U.S. 290, 299, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)). Therefore, imprecise advocacy or encouragement is not enough: "advocating `illegal action at some indefinite future time' is protected." Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists, 244 F.3d 1007, 1015 (9th Cir.2001) (quoting Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973)). There is nothing in the record before the Court to allow it to conclude that Melzer has engaged in illicit, proscribed conduct.
Nonetheless, just as in pure speech cases, Melzer's associational rights must also be viewed through the prism of his status as a public employee since the precedents forming the conceptual footings to Pickering make clear that Pickering cannot logically be read as invoking the need to balance the respective interests of the public employee and his employer only in pure First Amendment job-related speech cases. See Selzer, 629 F.2d at 815 (Kaufman, J., concurring in part and dissenting in part) ("the right to associate freely is not absolute, particularly when its exercise conflicts with the duties and responsibilities of a governmental employer"). What is less clear is the need for public concern analysis when the protected activity does not implicate speech at or about the workplace.
*247 For example, the Second Circuit has recognized that "it is anything but clear whether the public concern requirement applies to associational claims made by government employees," noting that "[s]ome courts have read Connick to say that a public concern must also be raised for government employees to state a First Amendment associational claim, while others have refused to apply the public concern requirement beyond the category of speech." Clue, 179 F.3d at 61 n. 2 (citing cases).
The debate has aptly been framed by one commentator as follows:
The courts holding that the Connick threshold test does apply to associational claims rely on one or more of the following three rationales for their holdings. First, these courts note that even though Connick and Pickering involved speech claims, an underlying issue in these cases was "whether government employees could be prevented or `chilled' by the fear of discharge from joining political parties or other associations that certain public officials might find subversive." Next, these courts contend that no logical reason exists to differentiate between speech and association. Finally, they argue that one First Amendment freedom should not be elevated above another, and, therefore, associational rights should not be exempt from the Connick test.
* * * * * *
The courts ruling that associational claims are exempt from the Connick test set forth two arguments: First, they point out that Connick involved only speech and did not raise associational claims. Second, and perhaps more importantly, these courts contend that they must respect the broad definition of protected associational activity established by the Supreme Court in NAACP v. Alabama ex rel. Patterson, and that Connick should not infringe upon that broad protection.
Paul Cerkvenik, Note, Who Your Friends Are Could Get You Fired! The Connick "Public Concern" Test Unjustifiably Restricts Public Employees' Associational Rights, 79 Minn. L.Rev. 425, 427-28 (Dec. 1994); see also of comparable effect, Mark Strauss, Note, Public Employees' Freedom of Association: Should Connick v. Myers' Speech Based Public Concern Rule Apply?, 61 Fordham L.Rev. 473, 475 (Nov. 1992). Suggested resolutions range from eschewing the Connick threshold public concern test regarding associational activities of public employees in favor of focusing exclusively on the Pickering balancing test, since that framework "preserves the Supreme Court's original broad view of the right of freedom of association while protecting the government's ability as an employer to deliver public services efficiently," Cerkvenik, 79 Minn. L.Rev. at 450, to prescinding between expressive and intimate associations. Strauss, 61 Fordham L.Rev. at 480-82. In this latter regard, it is reasoned that "Connick's public-concern rule should be applied to claims based on the right of expressive association because this right exists as an instrument or means of enhancing freedom of speech," but "Connick's public-concern rule should not be applied to those claims based on the right of intimate association, because this constitutionally recognized right, by definition, protects associations of highly personal interest." Id. at 495.
The Second Circuit in Clue has given a clue on its take on the issue, commenting in footnote dicta that "[t]he most sophisticated opinion on this question carefully distinguishes between `hybrid free speech/ free association claims, to which it believes the public concern requirement should apply, and pure free association claims, to which it concludes the public concern does not and ought not to apply.'" 179 F.3d at *248 61 n. 2 (citing to concurring opinion of Cudahy, J. in Balton v. City of Milwaukee, 133 F.3d 1036, 1041 (7th Cir.1998)). As explained by Judge Cudahy in Balton, "Pickering and Connick do not supply a relevant test for purely associational claims because such cases generally do not involve interference with the work relationship. This sharply contrasts with speech cases, or the hybrid speech/association cases cited by the majority," Balton, 133 F.3d at 1041, where the "content, form, and context of a given statement," which is the touchstone of public concern analysis, can invariably be discerned. Id. (internal quotation marks and citation omitted).
It is difficult to ascertain from Clue or Balton in this undeveloped area of First Amendment jurisprudence precisely what is meant by a pure associational claim as contrasted to a hybrid speech/association claim, especially when dealing with expressive associations, which by their very nature invariably entail speech on matters of public concern. The case Judge Cudahy relies upon in Balton as the analytic basis for determining when a court should "ignore[] any question of public concern," 133 F.3d at 1041, is instructive, but hardly a blueprint of analytic clarity. In that case, McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir.1968), addressing the issue of when a school district could dismiss a teacher for associational union activities, the court, while relying on Pickering, made no mention of the issue of public concern, as pointed out by Judge Cudahy in Balton. Instead, it simply noted, in finding the complaint to state a claim in the face of a motion to dismiss, that "[e]ven if th[e] record disclosed that the union was connected with unlawful activity," that fact would "not justify charging members with their organization's misdeeds," reasoning that "[a] contrary rule would bite more deeply into associational freedom than is necessary to achieve legitimate state interests, thereby violating the First Amendment." McLaughlin, 398 F.2d at 289. The court noted, however, that "[i]t is possible of course that at some future time plaintiffs may engage in union-related conduct justifying their dismissal." Id.
The only Second Circuit case addressing a hybrid speech claim is Knight, where the employees were disciplined for proselytizing while engaged in their work. In responding to the employees' contention that "theirs are hybrid claims, implicating both free speech and free exercise rights, and requiring a strict scrutiny analysis rather than analysis under Pickering," 275 F.3d at 166, the court recognized that "we have not yet addressed generally whether hybrid claims require a greater governmental justification than each component of the hybrid claim taken separately." Id. at 167. Regardless, it considered the issue irrelevant "due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state." Id. It consequently applied the Pickering balancing test, assuming arguendo, in apparent deference to the ritualistic public concern gate-keeping threshold, "that the religious speech at issue touch[ed] on a matter of public concern," id. at 164, reasoning:
The allegation that a state action that regulates public conduct infringes more than one of a public employee's constitutional rights does not warrant more heightened scrutiny than each claim would warrant when viewed separately. In both situations, the employer's interest remains the same and is entitled to the same weight in the constitutional balance.
Id. at 167.
While it may well be that the employer's interest may remain the same regardless of the categorization of the employee's constitutional rights, it surely cannot be the *249 case that the Second Circuit is suggesting in Knight that appropriate balancing can take place without considering and accounting for the nature and depth of the employee's constitutional rights. If so, Pickering balancing would invariably be unbalanced. See Blum, 18 F.3d at 1011 ("to determine the appropriate balance a court should consider both the nature of the [protected activity] and the nature of the services performed by the employee").
It may well be that the time is fast approaching, as indicated by the ever-mounting juridical discourse over the place of public concern analysis in the context of associational rights, when the courts should recognize that preoccupation with the public concern dogma birthed by Pickering and nurtured by Connick has obfuscated the singular need to simply identify in each case the underlying constitutional right of the public employee, of whatever stripe, that clashes with the employer's legitimate interest in promoting the efficiency of its public mission, as the sole predicate to Pickering balancing. To be sure, the concept of "public concern" always retains its intended utility as a threshold issue whenever the employee speaks as an employee in or about the workplace in assessing whether the speech truly is of constitutional magnitude or simply a personnel grievance.
This straightforward approach finds conceptual support in the Tenth Circuit's decision in Flanagan v. Munger, 890 F.2d 1557 (10th Cir.1989), involving disciplinary action against police officers for their part ownership in a video rental store which had amongst its inventory sexually explicit films. Mindful that the Connick public concern test was "intended to weed out speech by an employee speaking as an employee upon matters of personal interest," id. at 1564, the court reasoned that where the employee is not raising a personal grievance, such as in cases, like Flanagan, "involving employee nonverbal expression which is not at work nor about work[,] . . . it makes little sense to ask whether this speech is of public concern." Id. at 1565. The court in Flanagan reasoned that Pickering balancing consequently should be directly invoked simply because the plaintiffs were engaged in "clearly protected expression under the first amendment." Id. ("Sexually explicit films and the distribution of sexually explicit films have consistently been upheld as protected under the first amendment whether under the free speech or free press clauses."); see also National Treasury, 513 U.S. at 480, 115 S.Ct. 1003 (O'Connor, J., concurring in part and dissenting in part) (recognizing no need for public concern test prior to Pickering balance "to off-hour speech bearing no nexus to Government employmentspeech that by definition does not relate to `internal office affairs' or the employee's status as an employee"); Tindle v. Caudell, 56 F.3d 966, 970 (8th Cir.1995) (factually distinguishing case from holding in Flanagan that "public concern test does not fit cases involving employee whose expression did not take place at work and was not about work.").
Flanagan also cautions against giving credence to the so-called "heckler's veto" in the balancing process, finding there that the government's evidence "pointed only to potential problems which might be caused by the public's reaction to plaintiffs' speech," rather than evidence "of actual or potential internal disruption" caused by the speech. 890 F.2d at 1566-67. In that regard, the court noted that the Supreme Court's frequent rejection of the heckler's veto "as a justification for curtailing offensive speech in order to prevent public disorder," id., at 1566 (internal citations omitted), lent support to its holding that the government had "only an attenuated interest *250 in preventing plaintiff's speech." Id. at 1567.
As the Tenth Circuit in Flanagan and Justice O'Connor in National Treasury recognize, there is no province in trying to discern if a protected expression or association is in regard to a matter of public concern if it is not about work or related to work; it is sufficient in such cases to simply engage in Pickering balancing to discern the effect the expression or association had on the workplace. Direct balancing in those situations gives true recognition to the constitutional difference between a protected "personal" matter, be it intimate association or membership in an expressive association, and an unprotected "personnel" matter. See, e.g., Ross v. Clayton County, Georgia, 173 F.3d 1305, 1311-12 (11th Cir.1999) (exemplifying and citing cases directly applying Pickering balancing to personal conduct outside of the workplace).

III
Melzer's expressive activities, be they viewed in the context of freedom of speech, association or hybrid speech/association, neither occurred at work nor were about his work. Given that he was clearly engaged in protected constitutional activity, there is no purpose to engaging in public concern analysis before embarking upon Pickering balancing. In any event, Melzer's activities in promoting NAMBLA's principal mission to advocate the virtues of non age-related man/boy relationships, regardless of the lack of public approbation, would satisfy public concern analysis since they clearly relate to matters of social concern to the community. See e.g. Blum, 18 F.3d at 1012 ("speech advocating the legalization of marijuana, criticizing national drug control policy, and debating civil disobedience on its face implicates matters of public concern").
Applying Pickering balancing, the focus must first turn to placing a value on the protected activity since "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." Connick, 461 U.S. at 150, 103 S.Ct. 1684. The value can range from "most limited," Connick, 461 U.S. at 154, 103 S.Ct. 1684, to one of "significant weight." Piesco, 933 F.2d at 1157. What value should the Court place on Melzer's protected activities? It should not be dependent on the degree of disruption, which falls on the employer's side of the balancing ledger; nor should it be based upon majority sentiments. Here, value-based analysis can be aided by hypothetically considering whether Melzer could be terminated for being an active and outspoken member of an expressive association supporting the virtues of homosexuality for all consenting adults. There can be little doubt that there has been a marked societal shift in the level of tolerance and acceptance of adult homosexual relationships in recent times, and it is improbable that such associational activities outside of the school could today be outweighed by the perceived likelihood of school disruption. On the other hand, it seems equally apparent that advocating acceptance of homosexual relationships with those whose age may not lend itself to the capacity to make an informed consensual decision should not be on the same constitutional value scale.

IV
Turning to the resolution of the present case, it is doubtful whether any degree of disruption to the internal affairs of the school could justify Melzer's firing if he simply were a passive member of an expressive association espousing unpopular, indeed repulsive, notions of age-related parameters of homosexual relationships. To hold otherwise would be to eviscerate the time-honored notion, even if such organization *251 be deemed unlawful, that "[t]hose who join an organization but do not share its unlawful purposes and who do not participate in its unlawful activities surely pose no threat, either as citizens or as public employees." Elfbrandt v. Russell, 384 U.S. 11, 17, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (emphasis added); see also James, 461 F.2d at 572 n. 13 ("Although we can imagine situations in which a teacher would be so controversial because of his tenets or beliefs that he would be a disruptive force in the school, no one would suggest that he could be dismissed merely because he was identified with a particular cause if he did not preach that cause in class."). It is equally uncertain whether Melzer could be fired simply for external disruptions occasioned by the community's reactions since "[t]he reaction of a community cannot always dictate constitutional protections to employees." McMullen v. Carson, 754 F.2d 936, 939 (11th Cir.1985). However, the Court need not grapple with these issues since it has found that Melzer was discharged solely because of the likely disruption to the internal operations of the school as a consequence of the public exposure of the activities in which he participated during the course of his active, not passive, membership in NAMBLA.[15]See id. (differentiating between "passive" and "active" associational membership in supporting discharge of clerical employee in Sheriff's office). Given the limited First Amendment value that the Court ascribes to Melzer's protected activities and the nature of his public employment, Melzer's dismissal from the teaching ranks, under the facts and circumstances of this case, was warranted.
Of paramount significance were Melzer's writings for and active participation as a member of the Collective in shaping the contents of the Bulletin, which writings were made available to the public. Considering the nature of his public employment, Melzer's constitutional right to actively participate in NAMBLA's expressive activities was bound to publicly surface, as Melzer himself acknowledged, and to reasonably be found by his public employer, after a careful and extensive investigation, to be "potentially disruptive" to the operations of the school and Melzer's future effectiveness as a teacher. See Waters v. Churchill, 511 U.S. 661, 677-78, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (reasonableness of prediction of disruption is based on degree to which employer undertook an investigation of situation and whether employer took "the care that a reasonable manager would use before making an employment decisiondischarge, suspension, reprimand, or whatever elseof the sort involved in the particular case"). The Court attaches particular significance to the concerns of the student body, as articulated at its meetings, that students would not be able to concentrate in a classroom taught by a teacher who they knew advocated sex between men and boys, nor comfortably interact with the teacher, and the likelihood that students would refuse to attend Melzer's classes. In that regard, the Court credits the testimony of Dr. Lewittes that it would be "an extremely anxiety provoking and disruptive experience for the average child and adolescent" to be subjected to the feeling engendered by knowing that a teacher "has encouraged the disavowal or disruption of legal and moral codes that their families and the general community hold." Tr. at 1747-48. The Court also believes that Melzer's capacity to objectively assess situations requiring *252 reportage of man/boy sexual encounters to the authorities has likely been compromised since, as he candidly acknowledged, "[i]t would be a very difficult conflict." Tr. at 4532.

CONCLUSION
Under the facts and circumstances of this case, Pickering balancing supports Melzer's discharge and dismissal of the complaint.
SO ORDERED.
NOTES
[1] Melzer also seeks compensatory damages from the BOE, and compensatory and punitive damages against the individual defendants, who each claim qualified immunity.
[2] Under New York Education Law § 3020-a (McKinney 2001), a tenured teacher's discharge is a two-step process: First, the "school district or employing board" must make a finding of "probable cause." § 3020-a(2)(a). Next, the teacher has the right to a hearing before either a single hearing officer or a three member panel, at the teacher's choice, "when the charges concern pedagogical incompetence or issues involving pedagogical judgment;" otherwise, the hearing is before a single hearing officer. § 3020-a(2)(c). Hearing officers are provided by the American Arbitration Association. See § 3020-a(3). The hearing officer(s)' decision "shall state what penalty or other action, if any, shall be taken by the employing board," § 3020-a(4), and is subject to judicial review. § 3020-a(5). Pending the hearing officer's decision and mandated implementation of the decision by the employing board, see § 3020-a(4)(b), the teacher is suspended with pay. See § 3020-a(2)(b). The "exhaustion of state remedies, whether administrative or judicial, is not a prerequisite to maintaining an action under § 1983." Nussle v. Willette, 224 F.3d 95, 97-98 (2d Cir.2000)(citing Patsy v. Board of Regents, 457 U.S. 496, 508, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)).
[3] Melzer's complaint also contains a state law claim that he was discharged in violation of New York Labor Law § 201-d(2). Since Melzer's federal claim is dismissed, the Court, in the exercise of its discretion, declines to exercise supplemental jurisdiction over this claim. See 28 U.S.C. § 1367(c)(3). Furthermore, dismissal of the complaint renders academic the qualified immunity claims raised by the individual defendants.
[4] "DX" refers to exhibits introduced by defendants.
[5] "Tr." refers to the transcript of testimony taken during the hearing.
[6] The record is somewhat unclear in regard to the exact date that Melzer joined the Steering Committee. Melzer testified that he was on the committee between 1984 and 1994; however, Bulletins from as early as 1982 show that Melzer was a member of the Steering Committee at that time. Compare Tr. at 3809 with DX E.
[7] There are no Bulletins in evidence between March 1983 and December 1986.
[8] Again, there is a gap in the evidence, and the Court has no other information regarding publications during this time frame; furthermore, Melzer did not appear as a member of the Collective in the October 1991 issue.
[9] In New York, a person is deemed incapable of consent if they are less than seventeen years old. N.Y. Penal Law § 130.05 (McKinney 2001).
[10] Hereinafter, "PX" refers to Plaintiff's exhibits.
[11] Inexplicably, this individual is named "Joseph deJesus" in the caption of the complaint.
[12] The charges were preferred on September 22, 1993, and amended on October 20, 1993. Substantively, the amended charges do not differ from the original charges. Compare DX A with DX B.
[13] If the hearing officer be likened to an arbitrator, the Court ordinarily could afford his determination whatever weight it deemed appropriate. See McDonald v. City of West Branch, Michigan, 466 U.S. 284, 292 n. 13, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). Where, however, constitutional issues are implicated, federal district and appellate courts are each obliged to make an independent assessment of the factual record. See Boy Scouts of America v. Dale, 530 U.S. 640, 648-49, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) ("Because this is a First Amendment case where the ultimate conclusions of law are virtually inseparable from findings of fact, we are obliged to undertake an independent review of the factual record to ensure that the state court's judgment does not unlawfully intrude on free expression.").
[14] In National Treasury, the Court noted in that footnote, however, that Rankin was "the only case" of that nature. 513 U.S. at 466, n. 10, 115 S.Ct. 1003.
[15] The public exposure was caused by the NBC news story. Accordingly, the Court need not concern itself on this record with whether constitutional issues might arise if public exposure surfaced because of gratuitous inquiries by a public employer into an employee's associational activities.