**James HEIL, Plaintiff–Appellant,**

v.

**Robert SANTORO, Individually and as Chief of Police of the Village of Rye Brook, N.Y., Salvatore M. Cresenzi, Individually and as Mayor of the Village of Rye Brook and as Police Commissioner on the Board of Police Commissioners of the Village of Rye Brook, The Board of Police, The Board of Police Commissioners of the Village of Rye Brook, The Village of Rye Brook, New York, Christopher Russo, Individually and as Village Administrator of the Village of Rye Brook, Craig Benson, Defendants–Appellees.**

Docket No. 97–7368.

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1997.

Decided June 3, 1998.

Craig T. Dickinson, White Plains, New York (Lovett & Gould, White Plains, New York), for Plaintiff–Appellant.

Bertrand B. Pogrebin, Mineola, New York (James P. Clark, Rains & Pogrebin, Mineola, New York, on the brief), for Defendants–Appellees.

Before: OAKES, KEARSE, and FRIEDMAN, Circuit Judges *.

KEARSE, Circuit Judge:

Plaintiff James Heil appeals from a final judgment of the United States District Court for the Southern District of New York, Barrington D. Parker, Jr., *Judge*, dismissing his complaint, brought under 42 U.S.C. § 1983 (1994), alleging that defendants Village of Rye Brook, New York ("Village" or "Rye Brook"), its Board of Police, and various of its officials, questioned him and suspended him for 10 days without pay in retaliation for exercising his First Amendment rights to freedom of speech, freedom of association, and freedom to petition the government for redress of grievances. The district court granted summary judgment dismissing the complaint, ruling that the First Amendment interests of Heil, a Village police officer, in the speech in which he engaged were outweighed by defendants' interest in preventing interference with the proper functioning of the Village police department. On appeal, Heil contends that he spoke on matters of important public concern and that summary judgment was inappropriate. For the reasons that follow, we affirm.

## I. BACKGROUND

Most of the pertinent events occurred in 1994 and, as revealed in the parties' submissions on defendants' motion for summary judgment or in Heil's deposition, are not in dispute. At all relevant times, Heil was a police officer in the Rye Brook Police Department. After April 1994, he was also president of the Rye Brook Police Benevolent Association ("PBA"). In early 1994, Village officials began preliminary discussions with officials of the neighboring City of Rye, New York ("Rye" or the "City"), as to the possibility of consolidating the two municipalities' police forces. The Village authorized a feasibility study of such a consolidation, and defendant Robert Santoro, the Village police chief, discussed the matter with Heil, who in turn discussed it with PBA members. In May 1994, defendant Salvatore M. Cresenzi, the Village's mayor, sent Heil a letter inviting him to participate in the discussions with

* Honorable Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

respect to the proposed consolidation and providing him with al' of the relevant documents that had been generated.

At the end of May 1994, the collective bargaining agreement between the Village and the PBA expired. Between May and July, the two entities participated in several negotiating sessions without reaching agreement on a new contract. Heil made attempts to schedule further sessions but was unsuccessful.

In August 1994, defendant Craig Benson, who was labor counsel for the Village, co-authored, with labor counsel for the City, a three-page memorandum dated August 19, 1994 ("August Memorandum" or "Memorandum"), outlining a possible strategy for securing agreement by the PBA and the police union representing City policemen to the proposed consolidation. The August Memorandum noted that the major personnel change occasioned by the consolidation would be the elimination of several sergeants' positions, and it opined that this would make it difficult to obtain union support. The Memorandum suggested offering financial incentives for voluntary retirement of sergeants and other adversely affected officers, and it recommended that the municipalities adopt an aggressive negotiating stance:

> The Unions should be advised that the City and the Village are of the opinion that they have a statutory right to abolish their Departments and to provide police services through a newly created department. The Unions should also be advised that the City and Village have no obligation to negotiate the abolition of their Departments or the initial terms and conditions for employees of any newly created department.

(Memorandum at 1.) With regard to setting the terms and conditions of employment in the new department, the Memorandum stated:

> We believe the approach to take is to present the Unions with the spectr[e] of a contract that the newly formed Department would impose if there is no agreement with the Unions on the terms of the consolidation. Given the opportunity to initially unilaterally establish terms and conditions of employment, a new employer

would likely impose a contract with terms and conditions which are inferior to those which are contained in either of the current contracts. The parties can hopefully negotiate a contract similar to the existing contracts.

(Memorandum at 2–3.)

### A. Heil's Unfair–Labor–Practice Charge

The August Memorandum was addressed only to the mayors of the Village and the City, the Rye City Manager, and defendant Christopher Russo, the Village Administrator. The Memorandum was faxed to Russo on or about August 19. Elizabeth Bottali, who was then a secretary in the Village's administrative offices, saw the Memorandum and made a photocopy of it before placing the original in Russo's mailbox. Bottali gave the photocopy to her husband who was a police sergeant ("Sergeant Bottali") and was a member of the PBA. Sergeant Bottali gave the Memorandum to Heil.

Heil copied the Memorandum in reduced size on a single page, attached it to an "Improper Practice Charge" form of the New York State Public Employment Relations Board ("PERB"), and, on September 2, 1994, filed the form with PERB as an unfair-labor-practice charge against the Village. Heil checked boxes on the form to allege that the Village had violated New York Civil Service Law §§ 209–a(1)(a), (d), and (e), which deal with interference with employees' right to participate in a labor union, refusal to negotiate in good faith, and refusal to continue all the terms of an expired agreement. Under "Details of Charge," Heil referred cryptically to some terse statements attached to an arbitration demand that was filed contemporaneously with the unfair-labor-practice charge, and to the August Memorandum he appended to the unfair-labor-practice charge.

Defendants assert that on the top of the first page of the August Memorandum, as circulated to its addressees, was the label "CONFIDENTIAL MEMORANDUM." During the ensuing investigation, see Part I.B. below, Bottali and her husband were questioned by Village officials. Bottali stated that when she photocopied the Memorandum it bore the "CONFIDENTIAL MEMO-

RANDUM" heading; her husband stated that he did not alter the photocopy before giving it to Heil. As appended by Heil to the unfair-labor-practice charge, however, the Memorandum bore no such heading. Heil maintains that the photocopy he received from Bottali's husband did not bear the phrase "CONFIDENTIAL MEMORANDUM" and was not otherwise labeled confidential.

### B. The Investigation and the Disciplinary Proceedings

Upon realizing that a copy of the August Memorandum had been obtained by Heil, defendants initiated an investigation. Santoro asked Heil to meet him on September 9 at one of the Village's meeting facilities. When Heil arrived and realized he was to be questioned about the Memorandum by Santoro, Cresenzi, and Benson, he stated that he was taking medication in preparation for surgery the following week and could not answer questions; and he immediately left. Santoro followed Heil outside and ordered him to return. (See, e.g., Deposition of James Heil ("Heil Dep.") at 367 ("[Santoro said] something to the effect that I am going to have to order you back inside.").) Heil did not return.

Santoro promptly sent Heil a letter instructing him either to appear for questioning on September 12 or to provide details, substantiated by a note from his doctor, as to the medication he claimed prevented him from responding to questioning. Heil did not produce a doctor's note; on September 12, accompanied by a PBA attorney, he appeared for questioning. In response to questions, Heil related the events surrounding his receipt of the Memorandum, stating that the copy he had received did not bear the words "CONFIDENTIAL MEMORANDUM." Heil stated that he could not produce the copy of the Memorandum he received because he had shredded it.

On November 29, Santoro filed disciplinary charges against Heil. In the meantime, on November 8, PERB sent Heil a letter stating that his unfair-labor-practice charge against the Village was deemed withdrawn, and the matter was administratively closed. Heil attributes that withdrawal to the fact that collective bargaining between the Village and the PBA had been resumed.

The November 29 disciplinary charges against Heil alleged that he had violated departmental rules and regulations by (1) publicly disclosing confidential information, (2) failing to obey Santoro's order to return to the September 9 meeting, and (3) failing to provide truthful answers in the September 12 interrogation. Several disciplinary hearings were held before defendant Board of Police Commissioners. The Board dismissed the first charge against Heil during the course of the hearings, and it found him not guilty on the third charge. However, in early 1995, it found him guilty of disobeying Santoro's order to return to the September 9 meeting. As a result of being found guilty of that insubordination, Heil was suspended for 10 days without pay.

Disciplinary charges had also been filed against Sergeant Bottali for disclosing the Memorandum to Heil; but the charges against him were dismissed when the Board dismissed the charge that Heil had disclosed confidential information. "No disciplinary charges were filed against Elizabeth Bottali because she cooperated in the investigation and, thereafter, resigned from her position with the Village." (Supplemental Affidavit of Craig R. Benson ¶ 2.)

### C. The Present Suit

Heil commenced the present action in December 1994 (prior to the order of suspension), alleging that defendants' investigation and filing of charges against him constituted retaliation for his speaking out on matters of public concern and violated his First Amendment rights to freedom of speech, freedom of association, and freedom to petition the government for the redress of grievances. Following completion of discovery, defendants moved for summary judgment on the ground, inter alia, that their conduct did not violate Heil's First Amendment rights.

In a Memorandum Decision and Order dated February 28, 1997 ("Opinion"), the district court granted defendants' motion. Although the court found that there was a

genuine issue as to whether Heil's filing of the unfair-labor-practice charge with PERB was a substantial factor in defendants' decision to discipline him, Opinion at 16–17, it pointed out that that issue would be immaterial if, after conducting the requisite balancing analysis, the court concluded that Heil's exercise of his First Amendment rights was outweighed by defendants' interest in preventing disruption of police department work:

[A] government official may take an unfavorable employment action against an employee for speech—even on a matter of public concern—where the speech has the potential to disrupt the work environment. *Sheppard v. Beerman,* 94 F.3d [823, 827 (2d Cir.1996)]. When asserting this defense, "the [government's] burden in justifying a particular discharge varies depending upon the nature of the employee's expression.["] *Frank[ v. Relin,* 1 F.3d 1317, 1329 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)]. The closer the employee's speech reflects on matters of substantial public concern, the greater must be the employer's showing of a likelihood of disruption before the employee may be punished. *Jeffries[ v. Harleston,* 52 F.3d 9, 13 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995).] "[T]he court must thus perform a balancing analysis, measuring, *inter alia,* the extent to which the employee's speech touched upon matters of public concern against the extent to which the employee's conduct interfered with the functioning of the workplace." *White Plains Towing[ Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993)] (citing *Connick[ v. Myers,* 461 U.S. 138, 150–52, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)]).

Under the balancing test, the government's burden is to show likely interference, not actual disruption.... A corollary of this principle is that a government employer's reasonable predictions of disruption are entitled to "substantial weight even when the speech involved is on a matter of public concern." *Waters[ v.*

*Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d ·686 (1994)]; *see McCabe v. Sharrett,* 12 F.3d 1558, 1570 (11th Cir.1994) (public employer's interest "will weigh heavily if the employee's exercise of the [First Amendment] right would compromise loyalty and confidentiality"). Opinion at 18–19.

As to the nature of the speech at issue here, the court viewed the allegations in Heil's PERB charge as evincing "at least arguable social and political concern," *id.* at 14, because those allegations asserted that the Village was not complying with various state employment laws; but it noted that this speech came "close to the line separating public from private speech," *id.* at 15. Although Heil argued that he had been concerned "that the consolidation and resulting abolition of a number of sergeant positions would jeopardize the public's health and safety," and "that his interest in speech [was therefore] entitled to greater protection than the unfair labor charge alone would warrant," the court noted that "Heil did not raise that issue in his PERB charge." *Id.* at 14 n. 4. Hence, the court concluded that the speech in which Heil claimed a First Amendment interest did not concern issues of public health and safety, for "[w]hen balancing the employee's and the government employer's interests, 'abstract concern about a particular subject carries no weight if the employee chooses not to articulate it.'" *Id.* (quoting *Giacalone v. Abrams,* 850 F.2d 79, 86–87 (2d Cir.1988)). Further noting that the charge filed with PERB had been withdrawn as soon as the Village agreed to return to the bargaining table, the court concluded that "[p]ractically speaking, Heil's charges were an attempt by the police union to gain leverage in contract negotiations" and that "[a]dvancing the public's right to know about the Village's alleged failure to bargain was, at best, of secondary, if not tertiary, concern." Opinion at 19–20.

The court concluded that this concern was "clearly" outweighed by the Village's interest in maintaining "reasonable and effective control of the work place." *Id.* at 19. While Heil's goal was to force the Village back to the bargaining table,

[o]n the other side of the scale is the likelihood of disruption to police operations and the protection of the strong interest police departments have in maintaining "discipline, esprit de corps, and uniformity" among their employees. *See Kelley v. Johnson,* 425 U.S. 238, 246, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). That interest derives from the obligation of law enforcement agencies to protect the public, and justifies the enactment of rules and regulations which "place[ ] myriad demands upon the members of the police force, duties which have no counterpart with respect to the public at large." *Id.* at 245, 96 S.Ct. 1440. Because order and confidence between officers and their superiors are essential to the operation of a law enforcement agency, violations of department rules such as occurred here pose significant dangers. *See Giacalone v. Abrams,* 850 F.2d 79, [87] (2d Cir.1988).

Here town and police officials saw a sensitive memorandum they understood to be confidential appended to a public filing relating to an ongoing labor dispute. A proceeding ensued inquiring into the circumstances under which the memorandum was obtained and used. Defendants reasonably perceived a potentially serious violation of department rules and reasonably concluded that to overlook this violation would result in "likely interference" with the proper functioning of the department.... Giving these conclusions the "substantial weight" that is required, I find the potential disruption to departmental discipline outweighs Heil's interest in pressing charges before the PERB.

Opinion at 20–21.

Accordingly, the court dismissed the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Heil contends that summary judgment should not have been granted because there are material factual issues to be tried as to defendants' "motivation for investigating and imposing disciplinary action on" him. (Heil brief on appeal at 26.) We reject his contention and affirm for the reasons that follow.

■ It is by now well established that a public employee's freedom of speech is not absolute, *see, e.g., Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), for the government has a legitimate interest in "promoting the efficiency of the public services it performs through its employees," *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see, e.g., Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. at 142, 103 S.Ct. 1684. A public employee who seeks to recover on the ground that he has been disciplined because of the exercise of First Amendment rights must establish, as an initial matter, that his speech may be "fairly characterized as constituting speech on a matter of public concern," *Connick v. Myers,* 461 U.S. at 146, 103 S.Ct. 1684; *see, e.g., Rankin v. McPherson,* 483 U.S. at 384, 107 S.Ct. 2891, and that that speech was "at least a 'substantial' or 'motivating' factor" in the adverse action taken by the employer. *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.1993) (quoting *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If the employee meets these burdens, the government employer may nonetheless escape liability in either of two ways.

■ First, the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, *Waters v. Churchill,* 511 U.S. 661, 673, 677, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion), and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech, *see, e.g., id.* at 668, 673, 681, 114 S.Ct. 1878; *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995). Substantial weight is accorded the government employer's prediction that given speech has the potential for disruptiveness, but its prediction must be reasonable. Thus, an employer that has received a report of such speech must make a reasonable investigation before

deciding to take action against the employee. *See Waters v. Churchill,* 511 U.S. at 677–78, 114 S.Ct. 1878 (employer should proceed with "a certain amount of care," to wit, "the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case").

■ Second, even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech. *See, e.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. 568; *White Plains Towing Corp. v. Patterson,* 991 F.2d at 1059; *see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984). This principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct. *See, e.g., Waters v. Churchill,* 511 U.S. at 681, 114 S.Ct. 1878 ("An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 286, 97 S.Ct. 568.

■ In the circumstances of the present case, in light of the employer's duty, as described in *Waters,* to make a reasonable investigation before imposing discipline on an employee for engaging in protected speech, it is clear that Heil's plaint that defendants conducted an investigation is not a valid First Amendment claim. Although the circumstance that warranted investigation in *Waters* was uncertainty as to the content of the plaintiff's statement, whereas here there was no question that what Heil published to PERB was the August Memorandum, the Village indisputably had a legitimate concern as to how it came to pass that Heil had gained possession of, and disseminated, a Village document that was not addressed to him and was classified as confidential. There being no First Amendment violation in investigating, the reason for the investigation created no material issue to be tried.

■ Moreover, given the present record, we think there is no question that Heil would have been disciplined in connection with his September 9 conduct during that investigation without regard to his purportedly protected speech, for the only discipline imposed on Heil was his 10–day suspension, and Heil has admitted that that suspension was ordered "[a]s a result of his being found guilty of insubordination." (Heil Statement Pursuant to Local Rule 3(g), ¶ 48.) There was no genuine dispute as to either the regulatory or the factual basis for the finding of insubordination. The record includes the Village Police Department Rules and Regulations, which direct that "[o]fficers shall promptly obey any written or oral lawful orders of a superior officer." Rye Brook Police Department Rules & Regulations § 50.18, at 16. Santoro, the chief of police, testified that when Heil left the September 9 meeting stating that he would not answer questions at that time, Santoro ordered Heil to return to the meeting, and Heil refused to do so. Santoro's order was lawful because the Village was entitled to investigate the breach of confidentiality. We note that although Heil, in his Rule 3(g) Statement in response to defendants' motion for summary judgment, denied disobeying any order, stating that Santoro merely "ask[ed]" him to return (Heil Statement Pursuant to Local Rule 3(g), ¶ 25), that denial did not create a genuine issue to be tried. Heil's only support for his denial was the hearsay testimony of a deponent who was not present at the conversation, and Heil himself had testified under oath that he did not return to the September 9 meeting after Santoro said "something to the effect that I am going to have to order you back inside" (Heil Dep. at 367). Even if the unsworn Rule 3(g) denial had been supported by an affidavit from Heil, which it was not, the denial would not have created a genuine issue of fact to be tried, for a party opposing summary judgment does not create a triable issue by denying his previously sworn statements, *see, e.g., Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir. 1991). In sum, there was no genuine dispute

that Heil was lawfully ordered to return to the September 9 meeting, was insubordinate in failing to comply with that order, and was disciplined "[a]s a result of his being found guilty of insubordination." (Heil Statement Pursuant to Local Rule 3(g), ¶ 48.)

Heil presented no evidence to suggest that the Village would not ordinarily have disciplined a police officer for refusing to obey an explicit order from the chief of police to answer questions in a lawful investigation. Nor is there any indication that a 10–day suspension as discipline for such insubordination is disproportionate.

■ In the undisputed circumstances, including the police department's written policy against insubordination of the type in which Heil engaged here, the absence of any evidence that that policy is normally not enforced, Heil's acknowledged refusal to obey an explicit order from the police chief in pursuit of a lawful investigation, and the fact that the Bottalis, who did not refuse to answer questions during the investigation, were not disciplined despite the fact that it was they who improperly gave the Memorandum to Heil in the first place, we conclude that there is no question that Heil's insubordinate behavior during the investigation would have resulted in discipline regardless of the Village's displeasure with Heil for attaching the Memorandum to the PERB charge. The fact that Heil had engaged in speech that arguably touched on a matter of public concern did not immunize him from discipline for his subsequent insubordination hindering the lawful investigation into his dissemination of confidential material in the course of that arguably protected conduct. We conclude that in these circumstances, summary judgment dismissing the complaint was proper.

## CONCLUSION

We have considered all of Heil's contentions in this appeal and have found in them no basis for reversal. The judgment is affirmed.