336 F.3d 185
 Peter MELZER, Plaintiff-Appellant,
v.
BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Carol A. Gresser, Irene Impellizzeri, Victor Gotbaum, Michael J. Petrides, Luis O. Reyes, Ninfa Segarra, Dennis M. Walcott, individually and in their official capacities as members of the Board of Education of the City School District of the City of New York, Ramon Cortines, individually and as Chancellor of the City School District of the City of New York, Joseph Dejesus, individually and as Superintendent of the Bronx High Schools, Hollis Needleman, individually and as Assistant Superintendent of the Bronx High Schools, Edward Stancik, individually and as Special Commissioner of Investigation for the New York City School District and the City of New York, Defendants-Appellees.
 No. 02-7338.
 United States Court of Appeals, Second Circuit.
 Argued: December 3, 2002.
 Decided July 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Eugene B. Nathanson, New York, New York, for Plaintiff-Appellant.
 Ronald E. Sternberg, New York, New York (Michael A. Cardozo, Corporation Counsel of the City of New York, Leonard Koerner, Jonathan Pines, New York, New York, of counsel), for Defendants-Appellees.
 Before: VAN GRAAFEILAND, CARDAMONE, and JACOBS, Circuit Judges.
 CARDAMONE, Circuit Judge.
 Among the liberties an American citizen enjoys is the right to associate with whomever he or she chooses for whatever purpose. That right, Alexis de Tocqueville observed in discussing it 168 years ago in his classic book is "almost as inalienable in its nature as [the right of] individual freedom." Alexis de Tocqueville, Democracy in America 184 (Harvey C. Mansfield & Delba Winthrop eds. & trans., U. Chi. Press 2000) (1835).
 Peter Melzer (plaintiff or appellant), a New York City school teacher at Bronx High School of Science (Bronx Science or school) asserts that his constitutional rights to freedom of association and speech were violated when the defendant Board of Education of the City School District of the City of New York (defendant or Board) terminated his teaching position. He alleges that action was taken in retaliation for his membership in the North American Man/Boy Love Association (NAMBLA or Association).
 This appeal is from a judgment entered February 27, 2002 in the United States District Court for the Eastern District of New York (Block, J.), dismissing plaintiff's 42 U.S.C. § 1983 civil rights suit.
 
 BACKGROUND
 A. Facts Regarding Plaintiff
 1. Teaching Record
 
 1
 Plaintiff was a school teacher and an employee of the defendant Board, having taught high school science for over 30 years from 1962 until his suspension in 1993, and his ultimate termination in 2000. He obtained tenure in 1968 as a physics teacher at Bronx Science, one of three highly selective science-oriented high schools in New York City. The school actively vies with New York's other two prestigious science high schools for the City's top students.
 
 
 2
 During his years at Bronx Science Melzer taught grades nine through 12. He participated in a number of school-related activities, including a volunteer program to teach physics to area junior high school students. He also served as an advisor to the Bronx Science Physical Science Journal and its Bicycle Club, and organized the Regional Science Olympiad. For his school activities and teaching he received several commendations.
 
 2. Membership in NAMBLA
 
 3
 Melzer is a self described pedophile and admits to being sexually attracted to young males up to the age of 16. Despite this proclivity, the record before us reveals no evidence that plaintiff engaged in any illegal or inappropriate conduct at Bronx Science. Plaintiff's outlet as a pedophile is his participation in NAMBLA, which he joined in 1979 or 1980 to discuss with others his long-standing attraction to young boys.
 
 
 4
 NAMBLA's stated primary goal is to bring about a change in the attitudes and laws governing sexual activity between men and boys. It advocates the abolition of laws governing the age of consent for such activity and the abolition of laws that limit freedom of expression, including child pornography laws. It seeks to build a support network for men and boys, while educating the public on what it sees as the benevolent nature of its activities, and cooperating with the lesbian, gay, and other movements for sexual liberation.
 
 
 5
 Melzer became very active from early in his membership in NAMBLA and served it in a number of capacities. For over ten years he served intermittently as a member of NAMBLA's Steering Committee, a group that sets the Association's policy. He also served as the organization's treasurer and coordinated its fund-raising drives. Melzer's deep interest in the organization is further reflected in his attendance as one of three NAMBLA representatives at the 6th Annual International Pedophile and Youth Emancipation Conference in Amsterdam, the Netherlands, a meeting devoted to sharing information about the youth pedophile movement worldwide. Melzer co-founded NAMBLA's publication, the Bulletin, and at various times contributed articles and served as editor.
 
 3. NAMBLA's Bulletin
 
 6
 The NAMBLA Bulletin is published ten times a year and features articles on topics of interest to members. The Bulletin is the self-described voice of NAMBLA. It is distributed by direct mail and sold to the public at select magazine and book stores.
 
 
 7
 Articles appearing in the Bulletin offer insight into the organization's beliefs and purpose, as well as the extent of Melzer's involvement. Issues of the Bulletin where Melzer is listed on the masthead as editor included articles like "Staying Safe and Happy as a Man/Boy Lover," which appeared in October 1993. The article proffered advice developed by NAMBLA activists on how to deal with police, how to store contraband erotica to escape discovery, and how to keep the specifics of a relationship with an underage boy secret from authorities. That advice included: never answer police questions, avoid keeping photos of underage boys where police may find them, never discuss the specifics of an illegal relationship with therapists or social workers, and secure legal representation before you need it. Another article appearing in the January-February 1993 Bulletin gave advice on how to identify susceptible children and lure them into sexual acts. Melzer stated later that although he did not agree with the article, he did not believe most people would take the advice.
 
 
 8
 A published letter to the editors of the Bulletin, entitled "Good Touches" appeared in the December 1992 issue. The letter graphically instructed readers on ways to touch specific body parts. In his capacity as editor, Melzer sanctioned such pieces in the "Letters" section of the Bulletin because he thought they had value.
 
 
 9
 Plaintiff himself wrote several articles. One entitled "Police Infiltrator," appearing in December 1986, recounted the activities of a detective from the Manhattan South Public Morals Division, who posed as a NAMBLA ally and arrested at least one NAMBLA member. In a follow-up article Melzer complained that the officer coerced vulnerable NAMBLA members into mailing copies of Melzer's Bulletin articles to his employer, the defendant Board. In 1987 the Bulletin also reprinted a letter to the editor of Newsday Melzer had written explaining that NAMBLA believes the ability and the right to experience sexual pleasure is a gift enjoyable by everyone regardless of age or sex. The letter further stated that erotic acts involving young people are not automatically abusive or exploitative.
 
 B. Investigation of Plaintiff
 1. Membership in NAMBLA Becomes Public
 
 10
 Melzer's membership in NAMBLA first came to the Board's attention in 1984-1985 via an anonymous letter received by the school's then principal. The Board's Office of the Inspector General conducted an interview with plaintiff on March 29, 1985, during which Melzer declined to confirm or deny whether he was a member of NAMBLA. No administrative action was taken at that time. The investigation was reopened in May 1992 by the newly created Office of the Special Commissioner of Investigation for the New York City School District (Commissioner of Investigation), an investigative body created to succeed the Office of the Inspector General.
 
 
 11
 During the course of the reopened investigation in March 1993, a local television station aired a three-part news story on public school teachers who were members of NAMBLA. The story was broadcast on WNBC-TV Channel 4 in New York on March 2, 3, and 5, 1993. It featured a secretly recorded video of a NAMBLA meeting at which Melzer could be seen advising a non-tenured employee of the Board to keep his Association membership secret until he acquired tenure. The story also featured interviews with students, as well as an attempted interview with Melzer himself. Other news media soon picked up the story and further disseminated the fact that Melzer, a teacher at Bronx Science, was a NAMBLA member.
 
 2. Response by Bronx Science High School Community
 
 12
 In the wake of this media attention, Melzer became the center of heated discussion in the Bronx Science community. School principal Vincent Galasso attempted to prevent the airing of the first segment of the Channel 4 series, but was told by an NBC reporter, "not on your [expletive deleted] life." Galasso thereupon convened a number of school officials to discuss his concerns about Melzer and the attendant publicity. Since plaintiff was on sabbatical for the 1992-93 school year, the discussion focused on whether he should be allowed to return the following year. Galasso spoke to nearly 100 teachers and school officials, many of whom shared his concerns about whether Melzer should be teaching children and the effect the news story would have on student recruitment.
 
 
 13
 The Bronx High School of Science Parents' Association met to discuss the issue on March 3, 1993, right after the first installment of the news story was broadcast. Many of the 50 or 60 parents in attendance expressed anger at Melzer's NAMBLA affiliation. They threatened to remove their children and conduct a sit-down strike at the school if Melzer were allowed to return. A letter was drafted to the Board of Education Chancellor, the Mayor, and other public officials demanding that Melzer and any other known member of NAMBLA not be in a position of daily contact with the students at Bronx Science, or of any other New York City public school. In a personal meeting with the Chancellor, parents' association representatives strongly urged that Melzer not be permitted to return to the classroom, threatening to boycott the school and to call the news media if their views were ignored.
 
 
 14
 The students themselves held a 300-400 person assembly on March 11, 1993, where a majority of the 30-40 students who spoke opposed plaintiff's continued employment. A few students, however, expressed the view that a person not convicted of anything illegal should be allowed to practice his profession. School publications ran articles expressing opinions on both sides of the controversy. One stated that no matter how strange an organization may appear, people have the right to express their views, while another said plaintiff's actions should be condemned as "utterly detestable." Galasso estimated that over 90 percent of the student body was unhappy with Melzer's membership in NAMBLA.
 
 
 15
 Based on these reactions from the school community, Galasso decided that allowing Melzer to return to the classroom would be detrimental to the school. In September 1993 the Commissioner of Investigation issued its report recommending disciplinary action in Melzer's case. The report stated that it had examined the issues and concluded that serious disruption, as well as permanent loss of parental confidence is inevitable if Melzer is returned to the classroom. The investigation report concluded that articles in the Bulletin could serve as an instruction manual for the sexual abuse of children and can reasonably be assumed to have led to such abuse.
 
 C. Disciplinary Proceedings
 
 16
 As a result of this report, the Board filed disciplinary charges against plaintiff stating that he had "advanced the goals and activities of NAMBLA, and assisted in the publication of the NAMBLA Bulletin, including at times editing, writing and raising funds for this publication, all of which promoted illegal sexual activity between male adults and male children under the age of consent." Further, the Board charged that Melzer's activities had been widely reported, had caused disruption in his school and the school community, and had undermined his ability to serve as a teacher. Melzer requested a hearing pursuant to New York Education Law § 3020-a to contest the charges. After 30 days of hearings held over the course of three years, the hearing officer recommended that Melzer be terminated. The Board upon receipt of this recommendation dismissed plaintiff.
 
 D. Prior Legal Action
 
 17
 Melzer brought the instant § 1983 action in the Eastern District challenging his dismissal by the defendant Board. The district court conducted a bench trial, and in affirming the Board's decision, see Melzer v. Bd. of Educ., 196 F.Supp.2d 229 (E.D.N.Y.2002), found credible Galasso's reports of significant disruption at the high school. It concluded that "Melzer was terminated solely because his employer reasonably believed that the public exposure of [Melzer's] associational activities ... was likely to impair Melzer's effectiveness as a teacher and cause internal disruption if he were returned to the classroom." Id. at 245. The threat of such disruption, the district court believed, weighed more heavily than Melzer's rights to speech and association. Id. at 250-52.
 
 
 18
 With this factual background in mind, we turn now to a discussion of the legal issues.
 
 DISCUSSION
 I Pickering Test for Public Employees' Speech
 A. In General
 
 19
 The First Amendment protects the speech and association rights of an individual like Melzer, no matter how different, unpopular or morally repugnant society may find his activities. Nonetheless, it has been established law for over 30 years, since the Supreme Court decided Pickering v. Board of Education, that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, the government may impose restraints on the First Amendment activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large. See United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (Treasury Union).
 
 
 20
 Under what is now called the Pickering balancing test, public employees like plaintiff teacher do not leave their First Amendment rights at the schoolhouse door, even though it is plain that those rights are somewhat diminished in public employment. The test requires a court to consider the most appropriate possible "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. 1731 (hereafter Pickering or balancing test). The balancing test allows the government a degree of control over its employees to permit it to provide services to the public efficiently and effectively, see Connick v. Myers, 461 U.S. 138, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); see also Waters v. Churchill, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion), but ensures that public employers do not use their authority to silence discourse "not because it hampers public functions but simply because superiors disagree with the content of [the] employees' speech." Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).
 
 B. Pickering's Two-Step Approach
 
 21
 The Pickering test involves a two-step inquiry: first, a court must determine whether the speech which led to an employee's discipline relates to a matter of public concern; and, second, if so, the balance between free speech concerns is weighed against efficient public service to ascertain to which the scale tips. See Rankin, 483 U.S. at 384, 388, 107 S.Ct. 2891.
 
 
 22
 The first part of the inquiry, commonly referred to as the public concern test, serves a gatekeeping function for employee speech claims in federal courts. The First Amendment protects an employee only when he is speaking "as a citizen upon matters of public concern" as opposed to when he speaks only on matters of personal concern. Connick, 461 U.S. at 147, 103 S.Ct. 1684. If the speech that led to an employee's discipline was on a personal matter — for example, a complaint about a change in an employee's duties — the government is granted wide latitude to deal with the employee without any special burden of justification. Treasury Union, 513 U.S. at 466, 115 S.Ct. 1003; Connick, 461 U.S. at 148-49, 103 S.Ct. 1684.
 
 
 23
 When it is shown that the employee's speech was on a matter of public concern, the second step, or balancing portion of the test, comes into play. Under it the government has the burden of showing that despite First Amendment rights the employee's speech so threatens the government's effective operation that discipline of the employee is justified. See Treasury Union, 513 U.S. at 466, 115 S.Ct. 1003.
 
 
 24
 For an employee to prevail he or she must also demonstrate that the speech was the motivating factor causing the public employer to take adverse action. Heil v. Santoro, 147 F.3d 103, 109 (2d Cir.1998). Even when the government cannot show a compelling justification under Pickering for infringing on its employee's rights, the government still may succeed if it can demonstrate that it would have undertaken the same adverse employment action even absent the protected speech. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). By the same token, when the government prevails in the balancing test, the employee may still carry the day if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption. See Sheppard v. Beerman, 94 F.3d 823, 827 (2d Cir.1996).
 
 II Applicability of Pickering to Hybrid Speech/Associational Activities Unrelated to Employment
 A. Distinction Between This Case and Ordinary Speech Cases
 
 25
 The claim before us diverges from the usual line of cases requiring application of Pickering, which ordinarily applies in situations involving speech directed at an employer, made at the place of employment or directly concerning the employer in some way. See, e.g., Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156 (2d Cir.2001) (employee proselytizing clients while on public business); Hale v. Mann, 219 F.3d 61 (2d Cir.2000) (report critical of employer's policies); Clue v. Johnson, 179 F.3d 57 (2d Cir.1999) (union faction's criticism of management labor policies); Lewis v. Cowen, 165 F.3d 154 (2d Cir.1999) (objections to policies of Connecticut Gaming Board by Board employee); McEvoy v. Spencer, 124 F.3d 92 (2d Cir.1997) (police commissioner's criticism of police department); Sheppard, 94 F.3d at 826 (law clerk's criticism of judge); Piesco v. City of New York Dep't of Personnel, 933 F.2d 1149 (2d Cir. 1991) (senior personnel director's truthful testimony before state senate committee); Lefcourt v. Legal Aid Soc'y, 312 F.Supp. 1105 (S.D.N.Y.1970), aff'd, 445 F.2d 1150 (2d Cir.1971) (legal aid attorney's criticism of supervisor's policies disrupting internal operations).
 
 
 26
 The present case is unlike the above cited cases in two ways. One is that Melzer's termination stems not from something done in the workplace, but from First Amendment activities occurring outside the workplace and largely unconnected to it. The second is that the activity which prompted the Board to fire Melzer was not a specific instance of speech, or particular disruptive statement, but an associational activity of which speech was an essential component. Melzer's termination did not directly stem from any particular words he said or printed — the most inflammatory articles appearing in the Bulletin were not written by Melzer himself, and most of Melzer's admissions about his sexual preference were made after and as result of the scandal at Bronx Science. Although the Board's report cited the foregoing pieces of evidence in support of their decision, it is clear that the Board's basic justification for firing Melzer was the community's reaction to the message advocated by NAMBLA, its Bulletin, and Melzer himself through his active participation in the organization. Nonetheless, our view is that Pickering remains the applicable test.
 
 B. Applicability of Pickering
 
 27
 Several considerations prompt us to believe Pickering is the appropriate standard here. Addressing the first point of divergence — that the activity in question took place away from the workplace — we recognize that the balancing test's application is not limited to conduct occurring at or directly relating to the workplace. The Supreme Court in Treasury Union applied the Pickering test to a law that prohibited honoraria to government employees giving speeches outside their place of work, the content of which was unrelated to the speechmaker's employment. 513 U.S. at 466, 115 S.Ct. 1003. The Court instructed that although the situation fell outside the typical paradigm, the goal of striking an appropriate balance between employee and government interests is activated whenever the government seeks to regulate employees' protected speech, regardless of where it occurs or how closely it is related to work. Id. Attenuation of time, place, or content of speech from the workplace is ultimately accounted for in the balancing part of the process, but those factors will not absolutely preclude government regulation.
 
 
 28
 We and at least one other Circuit have likewise recognized the balancing test's applicability to a wider range of issues than just those arising in or concerning speech occurring at the workplace. See Pappas v. Giuliani, 290 F.3d 143, 150 (2d Cir.2002) (applying Pickering to police officer's speech made privately, off-duty and away from work); Bieluch v. Sullivan, 999 F.2d 666 (2d Cir.1993) (applying balancing test to speech made in course of political community activities unrelated to work); Flanagan v. Munger, 890 F.2d 1557 (10th Cir.1989) (applying such test to non-work related "speech" embodied in pornographic movies purveyed away from work).
 
 
 29
 Taking the second point of divergence from the usual Pickering paradigm — Melzer's termination did not arise solely out of specific disruptive statements — we think the balancing test is nonetheless appropriate. The root of the disruption at Bronx Science cannot be identified discretely as either Melzer's associational activities or the attendant speech, for the two are dependent on one another. Membership in NAMBLA was, surely, an associational activity. However, NAMBLA's primary purpose was advocacy, and Melzer, by his active participation and his role as editor of the Bulletin, furthered this advocacy. Thus, interconnecting associational and speech rights are in play.
 
 
 30
 Several circuits, including our own, have labeled such claims involving multiple First Amendment rights "hybrid" claims. See, e.g., Knight, 275 F.3d at 167; Balton v. City of Milwaukee, 133 F.3d 1036, 1041 (7th Cir.1998) (Cudahy, J., concurring in the judgment); Brown v. Hot, Sexy & Safer Prods., 68 F.3d 525, 539 (1st Cir.1995). Our analysis is unaffected by the presence of rights to both association and speech. We have recognized that where multiple branches of First Amendment protection are implicated by an employment decision, the affected rights enjoy no more protection than each would receive when viewed separately. See Knight, 275 F.3d at 167. Thus, we will protect plaintiff's interests adequately if we afford a level of Constitutional protection warranted for both speech and association.
 
 
 31
 Plaintiff's right to speech is undoubtedly amply protected by the Pickering test. See Treasury Union, 513 U.S. at 466, 115 S.Ct. 1003. Associational rights, when exercised in conjunction with speech, are also sufficiently protected by Pickering. We note that in some public employment contexts the right of association is given heightened protection, such as when low-level public employees engage in partisan political activities in opposition to their bosses' own political party. See Elrod v. Burns, 427 U.S. 347, 360-64, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Branti v. Finkel, 445 U.S. 507, 518-20, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). But we have ruled that such heightened protection is limited to the context of partisan political conduct. See McEvoy, 124 F.3d at 99 n. 4; Regan v. Boogertman, 984 F.2d 577, 581 (2d Cir. 1993). By contrast, where non-partisan associational activity involves speech and causes disruption to the workplace, a balance between government and employee rights adequately protects the interests of both. Cf. Branti, 445 U.S. at 517, 100 S.Ct. 1287 (noting the importance of balancing government and employee interests, but finding employee interests protected when partisan political affiliation among low-level employees is involved); Regan, 984 F.2d at 581 (same); see also Selzer v. Fleisher, 629 F.2d 809, 815 (2d Cir.1980) (Kaufman, J., concurring in part and dissenting in part) (arguing for application of Pickering to associational claim: "the right to associate freely is not absolute, particularly where its exercise conflicts with the duties and responsibilities of a governmental employee").
 
 
 32
 Moreover, we have found Pickering to be the appropriate standard where both expressive and associational activities are involved. In Clue, we applied Pickering to an adverse employment action arising out of employees' union-related pamphleteering and petitioning. 179 F.3d at 60-61. Although describing the claim as a purely associational one, the union activities in question more closely resembled the "hybrid" speech and association we find in the present case. Accordingly, we believe Pickering similarly protects plaintiff's speech and associational rights in the instant case.
 
 III Applicability of Public Concern Test
 
 33
 Having determined that Pickering provides the correct framework for our analysis, we turn to its application here. The first step in the analysis, the public concern threshold to First Amendment protection, was set forth in Connick, 461 U.S. at 146-48, 103 S.Ct. 1684, as a logical extension of Pickering; before we afford protection to a discharged employee, the public concern test requires us to find that the employee was speaking "as a citizen, in commenting upon matters of public concern." Pickering, 391 U.S. at 568, 88 S.Ct. 1731.
 
 
 34
 Application of the public concern test is made awkward in this case given the hybrid speech/associational nature of the rights involved. Whether an employee's First Amendment activity relates to a matter of public concern is ordinarily a question of law decided on the whole record by taking into account the content, form, and context of a given statement. See Connick, 461 U.S. at 147-48 & n. 7, 103 S.Ct. 1684; Lewis, 165 F.3d at 163; Luck v. Mazzone, 52 F.3d 475, 476 (2d Cir.1995) (per curiam). But, a court making that same decision when examining rights such as those asserted here, faces the fact that an association engaged in advocacy may deliver many different statements at many different times and places and under many different circumstances. What statements, at what locations and in what context are the ones that should be analyzed is shrouded in uncertainty. In rare situations, all of an employee's statements may be matters of public concern because they are made away from the workplace and relate to the interchange of ideas. In most situations, some statements are found to be of public concern, while others are not. It would be problematic for a court to determine whether the activity of an association — that speaks and acts in a myriad of different ways — relates to a matter of public concern.
 
 
 35
 For this reason, courts have questioned whether the public concern test is appropriate in cases like the present one. See Treasury Union, 513 U.S. at 480, 115 S.Ct. 1003 (O'Connor, J., concurring in part and dissenting in part) (recognizing no need for public concern test prior to applying Pickering balancing test to "off-hour speech bearing no nexus to Government employment — speech that by definition does not relate to `internal office affairs' or the employee's status as an employee"); Clue, 179 F.3d at 61 n. 2 (questioning need for public concern test in associational claims involving speech); Flanagan, 890 F.2d at 1562-63 (refusing to apply test to off-duty First Amendment activity).
 
 
 36
 Yet, we need not resolve the public concern issue in the case at bar because it is not critical to the outcome. For purposes of Melzer's claims, we assume arguendo that his activity centers on a matter of public concern, and is thus protected. See Pappas, 290 F.3d at 146 (assuming arguendo that speech was a matter of public concern). In addition, we observe that even if we were somehow to parse Melzer's activity into the public concern test, most of it would likely pass. NAMBLA's stated goal is to effect change in attitudes and laws regarding age of consent. The bulk of Melzer's activity, advocacy, and speech support this goal. Advocacy for a change in public perception and law, a fundamental component of democracy, is certainly a matter of public concern, regardless of the underlying subject matter. Consequently, we assume Melzer's activity is protected and move to the next part of the Pickering test.
 
 IV The Balancing Test Applied to Appellant's Claim
 A. Government's Burden
 
 37
 To satisfy Pickering and justify adverse action arising out of an employee's protected activity, the government has the burden to show that the employee's activity is disruptive to the internal operations of the governmental unit in question. See Connick, 461 U.S. at 150, 103 S.Ct. 1684; see also Knight, 275 F.3d at 164; Lewis, 165 F.3d at 163. The disruption must be significant enough so that it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388, 107 S.Ct. 2891.
 
 
 38
 Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable. See Waters, 511 U.S. at 673, 114 S.Ct. 1878 (plurality opinion) (giving "substantial weight to government employers' reasonable predictions of disruption"); Heil, 147 F.3d at 109 (holding "government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities" in a manner outweighing employee's interests). In balancing protected First Amendment activity against governmental disruption we take into account the "manner, time, and place" in which speech or activity occurred, see Connick, 461 U.S. at 152, 103 S.Ct. 1684; Lewis, 165 F.3d at 162, keeping in mind that the government is more likely to meet its burden when an employee's disruptive activity occurs in the workplace than when the equivalent activity occurs on an employee's own time, away from work. See Connick, 461 U.S. at 152-53 & n. 13, 103 S.Ct. 1684.
 
 
 39
 The content of the disruptive speech must also be considered. The more speech touches on matters of public concern, the greater the level of disruption the government must show. Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.1995). Extending this notion to hybrid speech/associational activities where possible, the more the association in question centers around expressive activities relating to matters of public concern, the greater the government's burden to show disruption.
 
 
 40
 A final but important consideration in the balancing test is the nature of the employee's responsibilities. The level of protection afforded to an employee's activities will vary with the amount of authority and public accountability the employee's position entails. See Rankin, 483 U.S. at 390-91, 107 S.Ct. 2891. A position requiring confidentiality, policymaking, or public contact lessens the public employer's burden in firing an employee for expression that offends the employer. See McEvoy, 124 F.3d at 103.
 
 
 41
 In conducting the balancing test we do not purport to assign a certain value to appellant's activities because to do so invites devaluation of that speech with which one personally disagrees. And, we would not state, as the district court did, that Melzer's activities are on a different constitutional value scale than other types of First Amendment rights more widely accepted by society. The balancing test is less a matter of calculating and comparing absolute values than it is a process that looks at all the circumstances in a given situation and determines which interest weighs more heavily. See id. at 98 n. 3; Brewster v. Bd. of Educ., 149 F.3d 971, 979-80 (9th Cir.1998).
 
 
 42
 Appellant's rights are not diminished by the fact that, as the Commissioner's investigation report states, some of NAMBLA's publications could be read as an "instruction manual" for illegally molesting children and can "reasonably be assumed to have led to ... abuse." Under our system an individual cannot be punished for associating with an organization or engaging in advocacy, absent a clear showing either that the organization is actively engaged in illegal activity or the advocacy is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam); see also Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam) (advocating "illegal action at some indefinite future time" is protected).
 
 
 43
 Even were it shown on this record — and it is not — that some of NAMBLA's members engage in illegality, or that the organization's aims are in fact illegal, Melzer himself could not be punished absent clear proof — also not present here — that he knew of such illegal aims and specifically intended to accomplish them. See Elfbrandt v. Russell, 384 U.S. 11, 15, 19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Noto v. United States, 367 U.S. 290, 299, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). Because we assume that Melzer's First Amendment activity possesses the highest value, it therefore places a heavy burden on the Board to justify dismissal.
 
 B. Balancing Test Satisfied
 
 44
 With the government's burden of proof in mind, we turn to an analysis of appellant's primary challenges to defendant's case against him. In so doing, because this case involves constitutional issues, our review is de novo. See Boy Scouts of Am. v. Dale, 530 U.S. 640, 648-49, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). At the outset, we note that we conduct our evaluation of appellant's rights versus governmental interest bearing in mind his position as a teacher in a public school. This position by its very nature requires a degree of public trust not found in many other positions of public employment. Although we recognize the danger in allowing the government to take action against an employee for his off-duty affiliations, in the context of teaching schoolchildren Melzer's activities strike such a sensitive chord that, despite the protection afforded his activities, the disruption they cause is great enough to warrant the school's action against him. We examine that action in light of appellant's challenges.
 
 1. Disruption
 
 45
 (a) Reported. Appellant attempts to minimize the reported disruption at the school, casting doubt on Galasso's assessments in particular, questioning the number of students and teachers with whom he spoke, and the tenor of the conversations. It is true that some parents and students expressed support for Melzer as a person harmlessly expressing his ideas. It is nonetheless entirely reasonable for the Board to believe that many parents and students had a strong negative reaction to him, and that such a reaction caused the school to suffer severe internal disruption. The discrepancies appellant points out in Galasso's assessments are minor and immaterial. Thus, we see no reason to disturb the district court's findings of disruption in the Board's favor.
 
 
 46
 (b) Predicted. Appellant contends that significant disruption cannot be predicted from the record before us. Quite the contrary, we think there is strong proof that Melzer's return to his teaching post would compromise the learning environment, particularly because of his effect on two critical constituencies — the students and the parents. An expert in psychology testifying for the Board stated that having a teacher with beliefs such as Melzer's would provoke anxiety and be a disruptive experience for the average student. He believed students would likely be unable to concentrate in plaintiff's class or be uncomfortable asking him for help after class or in any other one-on-one situation.
 
 
 47
 Melzer's position as a school teacher is central to our review. He acts in loco parentis for a group of students that includes adolescent boys. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). At the same time, he advocates changes in the law that would accommodate his professed desire to have sexual relationships with such children. We think it is perfectly reasonable to predict that parents will fear his influence and predilections. Parents so concerned may remove their children from the school, thereby interrupting the children's education, impairing the school's reputation, and impairing educationally desirable interdependency and cooperation among parents, teachers, and administrators. The Board contends as well that parental concern would compromise the competitive position of this high school vis-à-vis other elite high schools in New York City. While not a central concern, this also matters.
 
 
 48
 We also note, as the district court did, that disruption may arise from Melzer's possible inability to fulfill his duties as a teacher. Appellant candidly acknowledged that it would be difficult for him to decide whether to report an incident of child molestation at the school. Not only is reporting such incidents a part of any teacher's duties, lack of confidence in Melzer's will to do so would further undermine the trust of students and parents alike. Given all of the foregoing, we think the school authorities' predictions of further disruption should Melzer return find full support in the record. See Waters, 511 U.S. at 673, 114 S.Ct. 1878.
 
 2. Heckler's Veto
 
 49
 Appellant maintains, in addition, that allowing disruption caused by public furor over his NAMBLA-related activities to justify his termination amounts to an impermissible heckler's veto. We acknowledge the truism that community reaction cannot dictate whether an employee's constitutional rights are protected. See McMullen v. Carson, 754 F.2d 936, 940 (11th Cir.1985). We also recognize that allowing the public, with the government's help, to shout down unpopular ideas that stir anger is generally not permitted under our jurisprudence. See Feiner v. New York, 340 U.S. 315, 320, 71 S.Ct. 303, 95 L.Ed. 295 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker."); Flanagan, 890 F.2d at 1566-67.
 
 
 50
 Yet, Melzer's position as a teacher leaves him somewhat beholden to the views of parents in the community. Parents are not outsiders seeking to heckle Melzer into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function. Any disruption created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the balancing test and which may outweigh a public employee's rights. In consequence, we do not perceive an impermissible heckler's veto implicated in this case. Cf. Pappas, 290 F.3d at 146-47 (allowing community reaction to serve as basis for discharge of police officer).
 
 3. Retaliation for Protected Activity
 
 51
 Finally, Melzer insists that the Board's decision to terminate him is really motivated by a desire to retaliate against him for his NAMBLA membership, and not the disruption that his association causes. We find no proof in the record of retaliatory motive, nor was such evidence presented in any of the proceedings below. The fact that the Board knew of Melzer's NAMBLA membership as early as the mid-1980s and did not terminate him until after his membership became public knowledge makes it highly implausible that a retaliatory motive was the lever for the Board's action dismissing him.
 
 CONCLUSION
 
 52
 In sum, appellant's freedom to associate with and advocate for NAMBLA is protected by the First Amendment. The Board nonetheless meets its burden under Pickering by demonstrating that plaintiff's association and his degree of active involvement in NAMBLA caused disruption to the school's mission and operations justifying the Board's action terminating him.
 
 
 53
 Accordingly, for the reasons stated, the judgment appealed from is affirmed.